UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

| | |
|---|---|
| NORMAN WALKER, on behalf of himself and all others similarly situated,<br>　　　　　　　　Plaintiff<br><br>　　　v.<br><br>TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA – COLLEGE RETIREMENT AND EQUITIES FUND (TIAA-CREF), COLLEGE RETIREMENT AND EQUITIES FUND (CREF), TIAA-CREF INVESTMENT MANAGEMENT, LLC (TCIM), TEACHERS ADVISORS, INC. (TAI), and TIAA-CREF INDIVIDUAL & INSTITUTIONAL SERVICES, LLC,<br>　　　　　　　　Defendants<br><br>CHRISTINE BAUER-RAMAZANI,<br>　　　　　　　　Intervenor | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Docket No. 1:09-CV-190<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND IN SUPPORT OF HIS RULE 56(f) MOTION

Preliminary Statement

Defendant TIAA-CREF agreed to transfer Plaintiff Norman Walker's pension funds to another company on May 1, 2007. Despite the agreement, it did not cut a check until May 7. Over the weekend of May 5 and 6, Prof. Walker checked his TIAA-CREF account online. He noticed not only that it was still open, but that it had increased in value by several thousand dollars. Yet, the check TIAA-CREF cut on May 7 reflected only the value of Prof. Walker's account as of May 1. When Prof. Walker wrote to TIAA-CREF requesting payment of the difference, it refused.

TIAA-CREF did even worse by Plaintiff's colleague, Prof. Christine Bauer-Ramazani. Despite the same agreement to transfer her retirement funds on May 1, 2007, TIAA-CREF failed to cut a check for her until May 21, 2007. Prof. Bauer-Ramazani's account had also increased by several thousand dollars in the meantime. Once more, however, TIAA-CREF's check reflected only the value of her account on May 1, 2007.

Prof. Walker brought breach of fiduciary duty and prohibited transaction claims against TIAA-CREF under sections 404(a) and 406 of ERISA, 29 U.S.C. §§ 1104(a) and 1106. Prof. Bauer-Ramazani has now moved to intervene. Although merits discovery has not commenced, TIAA-CREF seeks summary judgment. Relying on an affidavit of TIAA's Senior Vice President Brian Bohaty, it argues that it processed Prof. Walker's transfer request in accordance with its prospectus, and that it neither benefited nor sought to benefit thereby.

Plaintiff's own investigation, and the limited pleadings and exhibits he has obtained from a similar case in Kentucky, suggest that Mr. Bohaty's affidavit is neither accurate nor complete. It appears, and Plaintiff and Intervenor expect to be able to prove, that TIAA-CREF used investment earnings from plan assets to pay its own financial obligations and the salaries of its own employees. It also appears that TIAA-CREF has compensated the "vast majority" of its other customers for delayed distributions – including delays as short as three days – despite its argument here that the prospectus and SEC rules prevent it from doing so. These additional facts not only confirm the ERISA violations alleged in this case, they suggest that TIAA-CREF may have committed others as well.

Because Plaintiff has not tested Mr. Bohaty's veracity by deposition or seen the underlying documents, he asks that this Court deny or suspend TIAA-CREF's summary judgment motion to permit reasonable discovery. As this Court has explained, "The standard for allowing additional

discovery is particularly lenient where discovery has not yet commenced." *Pietrangelo v. Alvas Corp.*, 664 F.Supp. 2d 420, 441 (D. Vt. 2009).

Apart from being premature, TIAA-CREF's motion is legally insufficient. TIAA-CREF's attempt to excuse its conduct on the basis of a prospectus fails for a host of reasons. To begin with, it is not the prospectus but the documents actually provided to plan participants which govern in ERISA cases. None of those allow TIAA-CREF to delay seven days before honoring a transfer or redemption request, nor do any of them give it the right not to pay out investment gains earned during the delay.[1] Moreover, TIAA-CREF failed to observe its own seven-day payment rule in the case of Intervenor Bauer-Ramazani and many others. Even if the documents said what TIAA-CREF wished, however, they could not give TIAA-CREF permission to violate its ERISA obligations. TIAA-CREF's failure to pay out investment gains, or otherwise compensate Plaintiff and Intervenor for the use of their plan assets, simply cannot be squared with its obligations under sections 404 and 406 of ERISA. At a minimum, the question of whether TIAA-CREF violated its fiduciary obligations or engaged in prohibited transactions under ERISA presents a genuine issue of material fact, precluding summary judgment at this early stage.

<u>Argument</u>

I.    SUMMARY JUDGMENT IS ONLY AVAILABLE IF, AFTER DISCOVERY, DEFENDANTS DEMONSTRATE THERE ARE NO ISSUES OF MATERIAL FACT.

"Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried, and that the undisputed material facts warrant judgment for the moving party as a matter of law." *Pietrangelo*, 664 F. Supp. 2d at 432 (citing *Celotex Corp. v. Catrett*, 477 U.S.

---

[1]    The prospectus also does not suggest that TIAA-CREF may retain investment gains on customer funds.

317, 322-23 (1986)). "The burden of demonstrating the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "Once a properly supported motion for summary judgment has been made, the burden shifts to the non-moving party to make a sufficient showing to establish the essential elements of that party's case on which it bears the burden of proof at trial." *Id.* (citing *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003)).

"In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Moreover, "summary judgment should only be granted if, *after discovery*, the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." *Hellstrom v. U.S. Dept. of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) (emphasis in original) (reversing grant of summary judgment where VA employee had not had opportunity to undertake discovery).

## II.   SUMMARY JUDGMENT IS INAPPROPRIATE HERE BECAUSE PLAINTIFF HAS NOT HAD AN ADEQUATE OPPORTUNITY TO CONDUCT DISCOVERY.

Federal Rule of Civil Procedure 56(f) states that: "If a party opposing [a summary judgment] motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be taken; or (3) issue any other just order." Fed. R. Civ. P. 56(f). This rule "provides, as interpreted by court opinions, that when a party facing an adversary's motion for summary judgment reasonably advises the court that it needs discovery to be able to present facts needed to defend the motion, the court

should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion." *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 386 (2d Cir. 2001).

The Second Circuit has made clear that "[o]nly in the rarest cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003) (quoting *Hellstrom*, 201 F.3d at 97). As the Second Circuit has warned, "[t]he nonmoving party should not be 'railroaded' into his offer of proof in opposition to summary judgment" by a premature motion. *Trebor Sportswear v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989). There are consequently numerous examples of courts in this Circuit rejecting premature summary judgment motions and deferring the issue until more discovery can be conducted. *See, e.g.*, *Miller*, 321 F.3d at 307 (reversing grant of summary judgment as "premature"); *Hellstrom*, 201 F.2d at 97-8 (vacating district court's grant of summary judgment as "premature" where plaintiff was "denied the opportunity to conduct discovery"); *Berger v. U.S.*, 87 F.3d 60, 65 (2d Cir. 1996) (reversing district court's decision where "district court did not wait until 'after discovery' to grant summary judgment"). This is true even in situations where the evidence presented by the plaintiff to oppose summary judgment is minimal. *See, e.g.*, *Pietrangelo*, 664 F. Supp. 2d at 440-41 (declining to enter summary judgment against plaintiff who was allegedly served a hot dog in an unsanitary fashion where plaintiff sought discovery regarding defendants' veracity).

In the Second Circuit, a party seeking further discovery to defeat a summary judgment motion must submit an affidavit showing:

> (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to

obtain them, and (4) why the affiant was unsuccessful in those efforts.

*Miller*, 321 F.3d at 303 (internal quotes omitted).  The affidavit need not, however, contain a precise recitation of the evidence to be discovered where "the facts sought [are] exclusively within defendants' possession."  *Id.*

    A.    <u>Defendants' Motion is Untimely Because There Has Been No Merits Discovery</u>.

TIAA-CREF seeks summary judgment here before merits discovery has commenced. Although Plaintiff's counsel has formally requested that TIAA-CREF produce documents relating to its practice of delaying the transfer and redemption of customer funds, it has yet to produce a single e-mail, memo, or other internal document.  Williams Aff. at 4-6, ¶¶ 13-17 (attached as Ex. 1).  The only documents TIAA-CREF has produced are copies of publicly-available prospectuses.[2]  *Id.* at 6, ¶ 17.

Yet it is clear from the limited number of documents Plaintiff's counsel has been able to obtain from *Rink v. CREF*, No. 07-CI-10761 (Ky. Cir., filed Oct. 29, 2007), a Kentucky lawsuit relating to the same practices at issue in this case, that TIAA-CREF does have numerous documents responsive to Plaintiff's requests.  For example, a motion to compel filed by the plaintiff in *Rink* discloses that Deloitte & Touche has many files relating to TIAA-CREF customers who did not receive timely distribution payments and were compensated for the delay.[3]  *See* Ex. 2.  The same motion refers to documents which were produced by TIAA-CREF

---

[2] TIAA-CREF also provided four one-page charts, which it drafted in response to Plaintiff's class discovery and this Court's Order, and a copy of the publicly-available complaint and answer from *Rink v. CREF. Id.*

[3] Pleadings from *Rink* reveal that Deloitte & Touche was retained by TIAA-CREF to identify participants who were "victimized by CREF's unauthorized retention of retirement account funds from October 2005 to the present."  Ex. H to Williams Aff. at 10.  Deloitte was hired "to verify the data, access

(continued on next page)

GRAVEL AND SHEA
A PROFESSIONAL CORPORATION
P. O. Box 369
BURLINGTON, VERMONT
05402-0369

in *Rink* relating to payment delays caused by computer problems. *See id.* at 4. Finally, an affidavit submitted to the court by plaintiff's counsel in *Rink* makes clear that TIAA-CREF produced various documents. *See* Ex. 3.[4]

Although Plaintiff has requested that TIAA-CREF produce copies of all pleadings, deposition transcripts, and documents which it produced in *Rink*, it has declined to do so. It claims to be bound by an Agreed Protective Order that it voluntarily entered into in that case. *See* Ex. 1 at 4-5, ¶¶ 13-16. TIAA-CREF maintains that the Order somehow prohibits it from producing its own internal documents, even though such documents are in its possession and were generated before the *Rink* case was ever brought. *See id.* Not only has TIAA-CREF used this Agreed Protective Order as a shield against Plaintiff's requests, it has put the onus on Plaintiff's counsel to modify it. *See id.* at 5, ¶ 15. Although Plaintiff's counsel has been working to do so, the Order has still not been modified. *Id.*

As Plaintiff's counsel explains in the accompanying Rule 56(f) Affidavit, he has not yet been able to take depositions in this case because of TIAA-CREF's resistance to his discovery requests. *See* Ex. 1. Moreover, Plaintiff would like to obtain the *Rink* materials before taking depositions to avoid repeating the costly and time-consuming discovery that has already occurred in *Rink*. *Id.*

B.    <u>Plaintiff Reasonably Believes That The Discovery He Seeks Will Create A Genuine Issue of Material Fact.</u>

The limited pleadings which Plaintiff has managed to obtain from the *Rink* proceeding

---

it[,] build a model[,] and return data to CREF 'in a format that let [CREF] make the remediation payments.'" *Id.* (citing Dep. of Beth Sutherland, Vice President, Product Delivery Department).

[4] The attached copy of this affidavit is missing page 2, presumably as a result of a scanning error by Kentucky counsel.

demonstrate that there are genuine issues of material fact in this case. While TIAA-CREF maintains that it is entitled to summary judgment because it was simply complying with the terms of its prospectus when it delayed the transfer of Plaintiff's funds for six days, the evidence from *Rink* demonstrates that this is not true. The *Rink* pleadings suggest that payment delays exceeding seven days are far from unusual at TIAA-CREF. According to the *Rink* court's decision on class certification, for example, the plaintiff, Richard D. Rink, had to wait 45 days for his transfer request to be processed. Ex. F to Williams Aff. at 1. The *Rink* court found that this delay occurred "due to problems that arose when CREF moved participant data files from an older record-keeping system to a newer system," *id.* at 1, and that "the affected participants number in the thousands." *Id.* In fact, Brian Bohaty, the Senior Vice President of Individual and Institutional Operations at TIAA, testified that "there were well in excess of a hundred thousand accounts that had delayed distribution issues." Ex. H to Williams Aff. at 10. In addition, a Payment List for the St. Michael's College Plan shows that, although Plaintiff Walker was paid within six days of the agreed-upon transfer date of May 1, 2007, more than 50 other plan participants were not paid within seven days. *See* Ex. 4. Intervenor Christine Bauer-Ramazani is one such individual. TIAA-CREF retained her funds for 20 days after the agreed-upon transfer date. *See id.* at 12.

The *Rink* court's class certification decision also makes clear that TIAA-CREF has in fact compensated numerous customers for payment delays. Ex. F to Williams Aff. at 1-3. The court states that TIAA-CREF compensated customers using four different methods: "out-of-pocket payments"; "delayed payment interest ('DPI')"; "'top-up' payments"; and "lost alternative investment." *Id.* at 2. According to the court, TIAA-CREF made payments not only to participants whose transfers were delayed by more than seven days, but also "to participants whose transfers were delayed more than three days." *Id.*

GRAVEL AND SHEA
A PROFESSIONAL CORPORATION
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

In *Rink*, TIAA-CREF represented to the court that it had instituted a comprehensive compensation program relating to delayed transfers and that "CREF investors received over $25 million in total DPI payments for the period from 2002 to March 2008." Ex. G to Williams Aff. at 11. TIAA-CREF also represented that "[a]ll participants who elected not to receive DPI or top-up payments elected to receive the third 'alternative investment' method of compensation" and that "Dr. Rink is the **only** investor participant during the critical time period to refuse the full DPI and top-up payments and the alternative investment method of paying compensation for delay in transferring investment; all other participants accepted what was offered." *Id.* Based on these representations, the *Rink* court remarked that "CREF maintains that *all* participants who experienced delayed transfers accepted one of the three payment options except Rink." Ex. F to Williams Aff. at 3 (emphasis added).

These statements do not appear to be accurate. TIAA-CREF did not compensate *all* of its customers who experienced delays. It never compensated Plaintiff or Intervenor. *See* Ex. 1 at 10, ¶ 24. Indeed, Plaintiff Walker wrote to TIAA-CREF specifically requesting compensation, but was denied. *See* Paper 61-6.

The fact that TIAA-CREF apparently compensated a significant number of its customers but refused to compensate Plaintiff Walker also raises concerns about the accuracy of its earlier interrogatory responses, sworn to by Mr. Bohaty. Specifically, TIAA-CREF stated that the transfer of Plaintiff's account was handled consistently with its policies and practices. *See* Paper 55-5 at 9-10. If TIAA-CREF had a policy of compensating customers for delays but refused to compensate Plaintiff and Intervenor, this response is at best a half-truth. Moreover, the compensation policy undercuts TIAA-CREF's contention that the prospectus and SEC Rule 22c-1(a) prohibit it from making any additional payment to Prof. Walker. *See* Paper 61-1 at 12.

Finally, Mr. Bohaty's deposition testimony in *Rink*, appears to contradict his statement here that "only the investors are affected by the gain and loss accounts" and that "[n]either CREF nor TIAA-CREF Individual & Institutional Services nor any other TIAA-CREF entity keeps the amounts in the gain or loss accounts for its own benefit." Paper 61-3 at 3, ¶ 10. At his deposition, by contrast, Mr. Bohaty explained that, if there is money left over after the gain and loss accounts are "trued-up" at the end of each quarter, it is used to pay the "administrative fee." *See* Ex. 2 at G-8. He then acknowledged that the administrative fee includes "salaries" and "direct expenses for investment management." *Id.* The fact that TIAA-CREF paid salaries and expenses for investment management out of its administrative fee account raises a genuine issue of material fact as to whether TIAA-CREF benefited from delaying the transfer and redemption of customer accounts.

C.   <u>Plaintiff Needs Discovery To Obtain Facts Relating To Defendants' Practice Of Delaying The Transfer And Redemption Of Customer Funds.</u>

There remain a number of important issues requiring discovery in this case. For example, Plaintiff does not know how TIAA-CREF determined who would receive compensation as a result of delays associated with the redemption and transfer of their funds. Ex. 1 at 10. He also does not know the source of the compensation paid to customers, or whether or to what extent TIAA-CREF's computer problems were resolved. *Id.* Plaintiff and Intervenor need discovery to determine how TIAA-CREF's redemption and transfer process works and has worked historically. They need to understand exactly what became of the investment gains on their accounts after they asked TIAA-CREF to close their accounts.

If Plaintiff and Intervenor can establish the facts referenced in the *Rink* materials, as they expect to, there will be a genuine issue as to whether Defendants violated their fiduciary duties of loyalty, disclosure, and impartiality to Plaintiff and other class members under section 404(a)

of ERISA, 29 U.S.C. §1106(a).  For example, by using the gains on Plaintiff's account to benefit current account holders and itself by lowering administrative expenses, TIAA-CREF has created a material dispute as to whether it was putting Plaintiff's interests first.  Its use of Plaintiff's plan assets also creates a material dispute as to whether it engaged in transactions prohibited by section 406(a) of ERISA, 29 U.S.C. § 1106(a).  Similarly, TIAA-CREF's failure to inform Plaintiff and other class members that it was experiencing significant computer problems which would prevent it from redeeming or transferring account funds in a timely fashion, and its failure to disclose that Plaintiff's account was subject to market risk for losses suffered by other transferring or redeeming customers, creates a material dispute as to whether TIAA-CREF breached its fiduciary duty of disclosure under ERISA.  Finally, the fact that TIAA-CREF has apparently compensated some redeeming or transferring customers, and has done so in varying amounts using different methodologies, creates a material dispute as to whether TIAA-CREF violated its fiduciary duty of impartiality under ERISA by treating similarly-situated account holders differently.

In situations such as this, where Defendants possess the information that is needed to refute summary judgment and have resisted discovery attempts, there can be no question that summary judgment is both premature and inappropriate. *See Miller*, 321 F.3d at 303.  "It is the duty of this court under Rule 56(f) to ensure that the parties have been given a reasonable opportunity to make their record complete before ruling on a motion for summary judgment." *Elliot Assoc., L.P. v. Republic of Peru*, 961 F. Supp. 83, 86 (S.D.N.Y. 1997).  In the instant case, Plaintiff needs to obtain relevant discovery materials from the *Rink* proceeding and take any

necessary depositions before responding to TIAA-CREF's motion for summary judgment.[5]  The

Court should reject Defendants' summary judgment request and permit discovery on the merits

to proceed.

III.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE
       CURRENT STATE OF THE RECORD.

   A.   TIAA-CREF's Prospectus Does Not And Could Not Allow It To Use Plaintiff's
        Retirement Funds Without Compensation.

Apart from the fact that its motion is premature, TIAA-CREF's arguments are either incor-

rect or raise factual disputes which preclude summary judgment.  TIAA-CREF argues first that its

prospectus entitled it to delay payment on transfer or redemption requests for seven days, without

paying out investment gains earned in the interim.  *See* Paper 61-1 at 10-14.  The argument fails

for at least five reasons.  First, it is not the prospectus which controls under ERISA but the docu-

ments actually supplied to the Plaintiff and other plan participants.  In this case, neither the docu-

ments supplied by St. Michael's nor by TIAA-CREF itself state or suggest that TIAA-CREF may

delay transfer or redemption payments while retaining investment gains earned in the interim.

Second, the prospectus itself does not say that TIAA-CREF may retain investment earnings on

plan assets after a transfer or withdrawal request.  Third, while the prospectus does require TIAA-

CREF to make payment within seven days of a transfer or redemption request, TIAA-CREF

ignored that requirement in the case of Intervenor Christine Bauer-Ramazani and many others.

---

[5] As detailed in the accompanying Rule 56(f) Affidavit, TIAA-CREF has resisted Plaintiff's
discovery efforts from the beginning of this proceeding.  While Plaintiff's counsel originally requested
that the parties hold a Rule 26(f) conference in the Spring of 2010, Defendants' counsel preferred to wait
until after its answer was filed and a schedule set for the overall case.  *See* Williams Aff. at 3, ¶ 8.  The
first answer was filed by TIAA-CREF on April 26, 2010, *see* Paper 23, and the second on February 4,
2011.  *See* Paper 66.  The discovery schedule is now due on March 21, 2011, 45 days after the last answer
was filed.  *See* Local Rule 26(a)(1).  The parties need to hold a Rule 26(f) conference immediately in
order to comply with this requirement.

Fourth, even if the plan documents did say what TIAA-CREF wishes they did, TIAA-CREF may not give itself permission to violate its fiduciary duties. The use of plan assets by a fiduciary such as TIAA-CREF is flatly prohibited by section 406 of ERISA, 29 U.S.C. § 1106. For each and every one of these reasons, summary judgment should be denied.

   1.  It Is Not The Prospectus But The Documents Actually Supplied To Plan Participants Which Control In ERISA Cases.

The first fatal flaw in TIAA-CREF's prospectus argument is that the prospectus does not govern. Rather, the documents actually supplied to plan participants control under ERISA. With respect to Plaintiff and Intervenor, those documents included a "Summary Plan Description" provided by St. Michael's College, as well as three booklets supplied by TIAA-CREF itself: "Rules of The Fund"; "Group Retirement Annuity Certificate"; and a "Service Directory." *See* Exs. 5, 6 and 7, attached.

As the Second Circuit has explained, ERISA "contemplates that the summary [plan description] will be an employee's primary source of information regarding employee benefits, and employees are entitled to rely on the descriptions contained in the summary." *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907 (2d Cir. 1990); *see also Burke v. Kodak Retirement Income Plan*, 336 F.3d 103, 110 (2d Cir. 2003); *Layaou v. Xerox Corp.*, 238 F.3d 205, 211 (2d Cir. 2001). By contrast, a prospectus "[is] required by federal securities law, rather than ERISA." *In re Schering-Plough Corp. ERISA Litig.*, No. Civ. A. 03-1204 (KSH), 2007 WL 2374989, at *4 (D.N.J. Aug. 15, 2007). Although a prospectus may sometimes be a "plan document" under ERISA, TIAA-CREF does not suggest that that is the case here.

In this case, neither the Summary Plan Description nor any of the documents supplied to participants by TIAA-CREF itself state that it may delay distributions after receiving transfer or redemption requests. They also do not say that TIAA-CREF may choose not to pay out

investments gains earned during the delay.  The only TIAA-CREF document which addresses payment at all is the "Service Directory."  It states simply that, when a plan participant requests a cash withdrawal, "We make payment after TIAA-CREF receives ALL the required completed papers including the application, waiver form, and your institution's authorization."  Ex. 7 at Bates Stamp NW 92.[6]

 2. The Prospectus Itself Does Not State That TIAA-CREF May Retain Investment Gains Earned After It Receives A Transfer Or Redemption Request.

 Besides the fact that it does not control, TIAA-CREF's prospectus does not in fact say that it may choose not to pay out investment gains earned on plan assets after a redemption or transfer is requested.  It simply does not address that issue.  The three bullet points excerpted on page 11 of TIAA-CREF's brief establish only that the transfer or redemption is "effective" at the end of the day the request is received; that the "unit values" are calculated as of that date; and that TIAA-CREF must make payment within seven days.  *See* Paper 61-1.  There is no suggestion that customer funds may remain invested at TIAA-CREF after the request is received, or that TIAA-CREF may retain investment gains earned on such funds.  Accordingly, even if the prospectus

---

 [6] Based on the Service Directory, Prof. Walker testified that he thought TIAA-CREF was required to make an immediate transfer in May, 2007, just as it had in December, 2006, when he requested an internal transfer from one CREF fund to another.  As he said:

 Q. Okay.  So when you transferred from the CREF growth to CREF equities in the transaction in December of 2006, you described earlier it, the transaction happened faster than the transfer from TIAA-CREF to Milliman; is that what you're saying?
 A. Immediately.
 Q. Okay.  And your view is that TIAA-CREF was required to make the transfers immediately also when transferring from TIAA-CREF to the Milliman platform?
 A. That's how I interpreted the handbook too.  I thought that that's what that said, that that's how, exactly how it would work.

*See* Ex. 8.

were the controlling document, TIAA-CREF would not be entitled to summary judgment.  As the

court recently explained in *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345 (S.D.N.Y.

2009), whether a particular statement is misleading, and whether it is material, "'are questions of

fact that are properly left for trial.'"  *Id.* at 363 (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420,

443 (3d Cir. 1996).  *See also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 439 (1976)

(question of materiality generally should be presented to a jury).[7]

> 3.      TIAA-CREF Did Not In Fact Follow The Payment Requirements Of Its
>         Own Prospectus In Many Cases.

TIAA-CREF insists that it is entitled to summary judgment because it made payment on

behalf of Plaintiff Walker within seven days, as its prospectus requires.  *See* Paper 61-1 at 1, 2, 4,

6, 7, 9, 11.[8]  TIAA-CREF did *not* meet its own payment deadline with respect to Christine

Bauer-Ramazani and many others, however.  TIAA-CREF retained her funds for 20 days, not

seven.  *See* Ex. 4.  No check was cut on her behalf until May 21, 2007.  *Id.*

---

[7]  The prospectus also does not prohibit TIAA-CREF from compensating customers for payment
delays, as TIAA-CREF suggests.  *Cf.* Paper 61-1, at 12.  Neither does SEC Rule 22c-1(a).  *See id.* Rule
22c-1(a), referred to as the "forward pricing rule," protects mutual fund customers against "riskless
trading."  *See* United States v. NASD, Inc., 422 U.S. 694, 710 n. 19 (1975).  That practice exploits the
fact that mutual fund shares are priced only twice per day, but buy and sell orders may be placed at any
time.  *See id.* at 706-12; *see also* David Ward, *Protecting Mutual Funds From Marketing-Timing
Profiteers: Forward Pricing International Fund Shares*, 56 Hastings L. J. 585 (Feb. 2005).

Rule 22c-1(a) does not purport to and has never been interpreted to prohibit a mutual fund which
keeps a customer's funds invested, or otherwise uses such funds after receiving a transfer or redemption
request, from disgorging its investment profits or otherwise compensating customers for the use of their
funds.  Indeed, such an interpretation is belied by the fact that TIAA-CREF itself compensated a
significant number of customers for payment delays.  *See* Ex. G to Williams Aff. at 11; Ex. H to Williams
Aff. at 10.

[8]  Prof. Walker's complaint is not with the delay, however, but with TIAA-CREF's refusal to pay
him the investment gains it earned on his plan assets during the delay, or otherwise compensate him for
the use of his funds.

Prof. Bauer-Ramazani's case is hardly unique.  By Plaintiff's count, TIAA-CREF also delayed the payments of more than 50 other plan participants at St. Michael's College for more than seven days.  *See* Ex. 4.  Such delays ranged from eight to 28 days.  *Id.*  In the *Rink* case in Kentucky, moreover, the plaintiff did not receive payment for 45 days.  *See* Paper 68-2, at 1.  According to the court there, TIAA-CREF's "own CR 30.02 (6) witnesses admitted in deposition testimony that thousands of participants had delayed distribution issues." *Id.* at 4.[9]

The fact that TIAA-CREF frequently delayed payment for more than seven days cuts the legs from under its argument that this class action case should be dismissed because it simply followed its own prospectus in processing transfer and redemption requests.  Such an argument is not only legally inadequate, it is also factually inaccurate with respect to numerous class members, including Intervenor.

> 4.   TIAA-CREF May Not Grant Itself Permission To Violate ERISA By Means Of A Prospectus Or Any Other Document.

Perhaps most importantly, TIAA-CREF would not be entitled to summary judgment even if the prospectus and plan documents said exactly what it wished they did.  That is because an ERISA fiduciary may not give itself permission to violate its fiduciary duties or to engage in transactions prohibited by ERISA.  Using plan assets for any purpose other than the benefit of the plan and plan participants, as TIAA-CREF did here, is prohibited.

The ERISA statute itself makes clear that a fiduciary may not point to plan documents to excuse a breach of its fiduciary duty.  Section 404(a)(1)(D) provides that "a fiduciary shall discharge his duties . . . in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with the provisions of ERISA.*"  29

---

[9]  Mr. Bohaty himself testified in Rink that "there were well in excess of a hundred thousand accounts that had delayed distribution issues." Ex. H to Williams Aff. at 10.

U.S.C. § 1104(a)(1)(D) (emphasis added). Consistent with the statute, the Supreme Court has emphasized that "trust documents cannot excuse trustees from their duties under ERISA." *Central States Pension Fund v. Central Transp., Inc.*, 472 U.S. 559, 568 (1985).

Based on section 404(a)(1)(D), the court in *In re Polaroid ERISA Litig.*, 362 F.Supp. 2d 461 (S.D.N.Y. 2005), rejected defendants' argument that they did not violate ERISA by purchasing Polaroid stock for an Employee Stock Ownership Plan, even though it was a poor investment, because plan documents required such purchases. *See id.* at 473-74. As the district court explained, "By force of statute, defendants had the fiduciary responsibility to disregard the Plan and eliminate Plan investments in Polaroid stock if the circumstances warranted." *Id.* at 474. Similarly, the Eighth Circuit in *Winer v. Edison Bros. Stores Pension Plan*, 593 F.2d 307 (3d Cir. 1979), rejected the trustees' argument that plan documents prohibited them from paying vested retirement benefits to two employees accused of taking kickbacks. Notwithstanding those documents, the *Winer* court ruled, "the Retirement Committee violated their fiduciary duties under ERISA when they refused to pay the pension benefits." *Id.* at 314. *See also Best v. Cyrus*, 310 F.3d 932, 935-36 (6th Cir. 2002) (where terms of plan document are inconsistent with ERISA's general duties of loyalty and prudence, ERISA controls); *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, No. 83 Civ. 5401 (DC), 1997 WL 278116, at *2 (S.D.N.Y. May 23, 1997) ("[A]n ERISA fiduciary cannot 'hide' behind the terms of a contract to insulate itself from liability for breaching its fiduciary duty.").

No matter what its prospectus might say, TIAA-CREF would not be entitled to summary judgment under section 404(a) or 406(a) of ERISA, 29 U.S.C. §§ 1104(a) and 1106(a). Section 404(a) requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." It embodies the "central and fundamental obligation imposed

on fiduciaries" and requires "undivided loyalty to beneficiaries." *Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir. 1978). An ERISA fiduciary's "decision must be made with an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

In the instant case, TIAA-CREF did not act "with an eye single" to the interests of Mr. Walker or Ms. Bauer-Ramazani. According to TIAA-CREF itself, it used investment gains earned after it received their transfer requests to reimburse itself for money it had paid out to other transferring or redeeming customers whose account values had fallen after their requests were received. *See* Paper 61 at 4-5.[10] If any money was left over, TIAA-CREF says, it was used to pay TIAA-CREF management expenses, including salaries. *See id.* Neither of these actions were solely in Plaintiff's or Intervenor's interests; indeed, they were not in their interests at all.

In the final analysis, the question of whether a fiduciary has violated its obligations under section 404(a) presents a factual issue to be decided at trial. The Second Circuit made that point in *Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982). There, the directors of Grumman Corp., who also served as trustees of its employee benefit plan, were faced with a tender offer from LTV Corp. *See id.* at 264. LTV offered $45 for shares which were trading publicly between 23 7/8 and 27 1/4. *See id.* at 265-66. The trustees not only declined to sell the Grumman shares held by the plan, they purchased 1.16 million more shares at prices of $36 to $38 per share, at a total cost of $44.3 million, in an attempt to fend off the bid. *See id.* at 264.

---

[10] TIAA-CREF says it places gains in a "gain account" held by its subsidiary, TIAA-CREF Individual Services. It explains that, if an account declines in value, it pays the difference to the redeeming or transferring customer and charges the amount to a "loss account" held by that subsidiary. Gains and losses, it explains, are "trued up" at the end of each quarter. In this way, TIAA-CREF reimburses itself for payments made to other customers from gains earned on Plaintiff's account. Plaintiff misses out on the gains earned on his funds.

The Second Circuit faulted the director/trustees on several grounds, but especially for their "woefully inadequate" consideration of whether it made sense for the pension plan to purchase the additional shares. *See Bierwirth*, 680 F.2d at 274-75. Nonetheless, it "accept[ed] that [the trustees] were honestly convinced that acquisition of Grumman by the debt-ridden LTV would mean a less bright future for Grumman and also that an LTV acquisition posed some special dangers to the participants of the Plan." *Id.* at 276. What their course should have been, however, the court did not reach. As it said, "How the situation will appear after a trial is a different matter which we cannot now decide." *Id.*[11]

     5.     Section 406(a) Of ERISA Flatly Prohibits TIAA-CREF's Use Of Plan Assets.

A final barrier to TIAA-CREF's summary judgment motion is section 406(a)(1)(D) of ERISA, 29 U.S.C. § 1106(a)(1)(D). It prohibits the "use by . . . a party in interest of any assets of the plan." As the Third Circuit explained in *Reich*, Congress enacted section 406 "with the goal of creating a categorical bar to certain types of transactions that were regarded as likely to injure a plan," namely, those "that had been used in the past to benefit other parties at the expense of the plans' participants and beneficiaries." *Reich*, 57 F.3d at 275. *Id.* As the court noted:

> Before ERISA, plans could generally engage in transactions with
> related parties so long as the transactions were 'arms-length.'

---

[11] Other courts also hold that breach of fiduciary claims under ERISA present trial issues. *See Reich v. Compton*, 57 F.3d 270, 279-82, 285-91 (3d Cir. 1995) (reversing summary judgment for defendants on breach of loyalty and prudence claims, among others); *Hunter v. Custom Bus. Graphics*, 635 F. Supp. 2d 420, 430 (E.D. Va. 2009) (denying summary judgment on claim that defendant breached fiduciary duty by failing to make same percentage contribution to plan for all employees); and *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1228-29 (N.D. Cal. 2008) (denying summary judgment on claim that plan breached fiduciary duty or engaged in prohibited transaction by paying mutual fund adviser's service fees).

> Unfortunately, this rule was difficult to police and thus 'provided an open door for abuses' by plan trustees.

*Id.* (citation omitted).[12]

In the instant case, TIAA-CREF does not dispute that it used the plan assets of Plaintiff Walker. Both Plaintiff's and Intervenor's retirement accounts increased in value after they requested transfers, but such increases were not paid to them. The case thus resembles the First Circuit's decision in *Mogel v. UNUM Life Ins. Co. of America,* 547 F.3d 23 (1st Cir. 2008). The defendant there mailed a checkbook to life insurance beneficiaries who were entitled to the payment of death benefits. *See id.* at 25. It told them "that (1) plaintiffs' death benefits plus applicable interest had been deposited in a UNUM Security Account, (2) plaintiffs could write checks from $250 up to the balance in the account, and (3) interest would be paid on the accounts at a variable rate." *Id.* Like Professors Walker and Bauer-Ramazani here, the plaintiffs alleged violations of section 404 and 406 of ERISA, because "UNUM failed to credit the accounts with the full amount UNUM earned investing the funds." *Id.* at 26 n. 6.

The First Circuit held that UNUM had acted as an ERISA fiduciary by retaining the death benefits. *See Mogel,* 547 F.3d at 26. As it said, "Until a beneficiary draws a check on the Security Account, the funds represented by that check are retained by UNUM *and UNUM had the use of the funds for its own benefit.*" *Id.* (emphasis added). Accordingly, the *Mogel* court vacated and remanded the lower court's decision dismissing the plaintiffs' section 406 claims. *Id.* at 27.[13]

---

[12] *Reich* points out that "Congress adopted section 406(a) of ERISA to prevent plans from engaging in certain types of transactions.

[13] The First Circuit also rejected UNUM's argument that, as an insurer, it was entitled to an exemption from ERISA's fiduciary obligations. *See id.* at 26-27. TIAA-CREF has not asserted that it is entitled to a statutory exemption here.

Unlike the plaintiffs in *Mogel*, Professors Walker and Bauer-Ramazani did not even have the option of writing a check on their accounts. Rather, TIAA-CREF kept them invested in securities. TIAA-CREF says it used the investment earnings on their accounts to reimburse itself for money it had paid other customers whose account values dropped after they requested a redemption or transfer, with the remainder being used to lower administrative expenses for current customers. Paper 61-1 at 4-5. Section 406(a) does not give TIAA-CREF the option to use Plaintiff's or Intervenor's plan assets for any purpose, however. The ban is categorical. As the Second Circuit said in *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987), section 406 requires fiduciaries to avoid such transactions "no matter how sincerely they may believe that such transactions will benefit the plan."

## IV.   TIAA-CREF'S MOTIVE AND BENEFIT ARE LEGALLY IRRELEVANT BUT FACTUALLY INCONTROVERTIBLE.

### A.   The Question Of Who Benefited From An ERISA Violation Is Not Germane To Whether A Violation Occurred.

TIAA-CREF asserts that it not only followed the terms of its prospectus but that it did not benefit or seek to benefit by refusing to pay out investment gains earned on Plaintiff's funds after his transfer request. *See* Paper 61-1 at 1. The point is, however, that someone other than Plaintiff (and Intervenor) realized the benefit of the gains. Therein lies the ERISA violation. From a factual standpoint, moreover, TIAA-CREF did indeed benefit.

As discussed in Part III above, the use of plan assets by a party-in-interest or fiduciary is a *per se* violation of section 406 of ERISA, 29 U.S.C. § 1106(a). *See, e.g.*, *MER Inv. Co. v. Fitzsimmons*, 685 F.2d 283, 287 (9th Cir. 1982) (describing § 406(a) as "a broad per se prohibition of transactions ERISA implicitly defines as not arm's length"). The Second Circuit has emphasized that the policy of protecting participants requires that section 406 be "broadly con-

strued" and that "liability be imposed even where there is 'no taint of scandal, no hint of self-dealing, no trace of bad faith.'" *Lowen,* 829 F.2d at 1213 (quoting *Cutaiar v. Marshall*, 590 F.2d 523, 528 (3d Cir. 1979)). The question of whether the fiduciary ultimately benefits is beside the point. As the Second Circuit has warned, fiduciaries must avoid prohibited transactions "no matter how sincerely they may believe that such transactions will benefit the plan." *Id.*

A trustee also need not benefit or have a motive to do so in order to breach its fiduciary duty under section 404(a) of ERISA. That point is illustrated by *Marshall v. Cuevas*, 1 Empl. Benefits Cas. (BNA) 1580, 1979 U.S. Dist. LEXIS 13516 (D.P.R. 1979). The Secretary of Labor there sought the repayment of $14,275.23 paid by a union pension plan on behalf of the widow of the union's founder. According to the court, the founder had "worked very hard for a number of years at minimal salary from the union and without seeking reimbursement for his legitimate expenses incurred on behalf of the plan." *Id.* at *2. It explained that "this gift was made to the widow to save the family home." In sum, it said, "[t]here is no question that the transfer was not made for the personal gain of the defendants." *Id.*

The *Cuevas* court nonetheless agreed with the Secretary that "[w]hile the action taken by defendants was morally commendable, it was a violation of the law." *Cuevas*, 1979 U.S. Dist. LEXIS 13516, at *3. The court had "no option but to find for the plaintiff" and hold the plan fiduciaries jointly and severally liable for the amount of the gift. *Id. Cuevas* is widely cited for the principle that the duty of loyalty "may be breached when the fiduciary acts in favor of the interests of a third party, regardless of benefit." James F. Jordan et al., *Handbook on ERISA Litigation* § 403[A] (3d ed. 2011). *See also* Donald B. Trone, et al., *The Management of Investment Decisions* at 277 (1996); Deborah M. Weiss, *Pension Benefit and Legal Investment Law: The Regulation of Funded Social Security*, 64 Brook. L. Rev. 993 (Fall, 1998). Cases to

the same effect include *Reich*, 57 F.3d 270, 278 (3d Cir. 1995), and *Marshall v. Kelly*, 465 F.Supp 341, 350-51 (W.D. Okla. 1978).

      B.      <u>TIAA-CREF Did In Fact Benefit From The ERISA Violations Alleged Here</u>.

Although irrelevant from a legal perspective, the facts which have emerged from *Rink v. CREF* leave little doubt that TIAA-CREF did indeed benefit from investment gains earned on customer accounts after it had received a transfer or redemption request.  As CREF told the court in *Rink*, problems with timely payments "began in 2005 during the conversion of a computerized record-keeping system from the prior outdated 'Legacy' platform to the newer 'Omni' platform." Ex. G to Williams Aff. at 8.  Remarkably, such problems appear to have continued through at least March, 2008. *See id.* at 11.  According to deposition testimony Senior Vice President Brian Bohaty gave in *Rink* "there were well in excess of a hundred thousand accounts that had delayed distribution issues." Ex. H to Williams Aff. at 10.

As Mr. Bohaty notes in his affidavit in this case, "To fund transfer or withdrawal payments, CREF sells accumulation units (similar to 'shares') in the variable annuity." Paper 61-3, ¶ 7.  However, "[t]hese sales are not always on the same day as the effective date.  Rather, they can occur several days later." *Id.*

TIAA-CREF encountered financial issues as a result of this lag time.  As Mr. Bohaty observes, "The market value of the annuity might be different on the sale date than it was on the effective date." Paper 61-3, ¶ 8.  Further, "[i]f the market value of the annuity has declined between the effective date of the request and the date that units are sold to fund the payment, CREF is still required to pay the investor the value of the his [sic] accumulation units as of the effective date, not the sale date." *Id.*[14]

---

[14] The requirement stems from SEC Rule 22c-1, discussed in Part IIIA, above.

(continued on next page)

GRAVEL AND SHEA
A PROFESSIONAL CORPORATION
. O. BOX 369
URLINGTON, VERMONT
5402-0369

- 23 -

Mr. Bohaty states that TIAA-CREF did make up the difference, charging it to a "loss account" held by Defendant TIAA-CREF Individual & Institutional Services. *See* Paper 61-3, § 8. However, TIAA-CREF chose not to absorb this loss itself, even though the delay was caused by its own computer problems. Rather, it reimbursed itself from investment gains earned on accounts which had increased in value after the effective date. As Mr. Bohaty relates, such gains had been deposited in a "gain account." *See id.*, ¶¶ 9-10. Under ERISA, however, TIAA-CREF may not use plan assets for any purpose. Rather, it must pay investment gains earned on participants' funds to the participant.

Nor did TIAA-CREF's benefit stop there. Mr. Bohaty states that, in the event gains exceeded losses for a particular quarter, the difference was used to pay TIAA-CREF's "administrative fees." *See* Paper 61-3, ¶ 10. Mr. Bohaty acknowledged in his deposition in *Rink* that such fees include "salaries" and "direct expenses for investment management." Ex. 2 at G-8. TIAA-CREF thus enjoyed a direct benefit from investment earnings on plan assets.[15]

---

[15] Mr. Bohaty states that administrative fees charged to current, non-exiting TIAA-CREF customers would be reduced in such circumstances. *Id.* That statement remains to be tested by discovery. Even if true, however, it would not absolve TIAA-CREF of its duty to pay earnings on Plaintiff's plan assets to Plaintiff.

<u>Conclusion</u>

TIAA-CREF's summary judgment motion is premature, factually inaccurate, and legally
unsound.  It should be denied or continued to permit Plaintiff to conduct reasonable discovery.
Even if the motion were not premature, moreover, it would have to be denied because there are
genuine disputes of material fact and TIAA-CREF is not entitled to judgment as a matter of law.

Dated:          Burlington, Vermont
                February 22, 2011

                                        <u>/s/ Norman Williams</u>
                                        Norman Williams, Esq.
                                        Robert B. Hemley, Esq.
                                        Gravel and Shea, A Professional Corporation
                                        P.O. Box 369
                                        Burlington, VT  05402-0369
                                        (802) 658-0220
                                        nwilliams@gravelshea.com
                                        rhemley@gravelshea.com
                                        For Plaintiff and Intervenor