# UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT


| | | |
|---|---|---|
| CHRISTINE BAUER-RAMAZANI and | ) | |
| CAROLYN B. DUFFY, on behalf of | ) | |
| themselves and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. 1:09-cv-190 |
| | ) | |
| TEACHERS INSURANCE AND ANNUITY | ) | |
| ASSOCIATION OF AMERICA - COLLEGE | ) | |
| RETIREMENT AND EQUITIES FUND | ) | |
| (TIAA-CREF), COLLEGE RETIREMENT | ) | |
| AND EQUITIES FUND (CREF), TEACHERS | ) | |
| INSURANCE AND ANNUITY | ) | |
| ASSOCIATION OF AMERICA (TIAA), | ) | |
| TIAA-CREF INVESTMENT | ) | |
| MANAGEMENT, LLC (TCIM), TEACHERS | ) | |
| ADVISORS, INC. (TAI), AND TIAA-CREF | ) | |
| INDIVIDUAL AND INSTITUTIONAL | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |


## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

BACKGROUND .................................................................................................... 3

I.       The TIAA-CREF Entities. ....................................................................... 3

II.      The TIAA-CREF Variable Annuity Products.......................................... 4

III.     Transactional Fund Earnings ("TFE"). ................................................... 6

IV.      Delayed-Payment Interest, Top-Up Payments, And Internal Transfers. .......................... 7

V.       Plaintiffs. .................................................................................................. 8

VI.      Plaintiffs' Claims. ................................................................................... 10

STANDARD OF REVIEW ................................................................................... 10

ARGUMENT ......................................................................................................... 11

I.       Plaintiffs' Duty Of Loyalty Claim (Count I) Fails On At Least Two Levels. ................ 11

         A.       Plaintiffs' Duty Of Loyalty Claim Fails Because Plaintiffs Cannot Show
                  That TIAA-CREF Acted With An Improper Motive To Benefit Itself Or
                  Anyone Other Than ERISA Plans. ....................................................... 12

                  1.       TIAA-CREF's Handling Of TFE Gains And Losses Was Dictated
                           By The Terms Of The Governing Prospectuses. .................................... 13

                  2.       TIAA-CREF's Procedures For Handling TFE Gains And Losses
                           Benefitted Plan Participants Such As Plaintiffs, Not TIAA-CREF......... 14

         B.       No TIAA-CREF Entity Acted As An ERISA Fiduciary In Handling TFE
                  Gains. .................................................................................................... 17

                  1.       TFE Gains Are Not "Plan Assets." ........................................................ 17

                  2.       Plaintiffs And Their Plans Had No Property Interest In Gains
                           Beyond The Effective Date...................................................................... 20

                  3.       The Timing Of TIAA-CREF's Processing Of Transfer And
                           Withdrawal Requests Creates No Property Rights In TFE...................... 20

II.      Plaintiffs' Duty of Impartiality Claim (Count II) Fails For Multiple Reasons. ............ 24

         A.       ERISA Imposes No Duty Requiring TIAA-CREF To Give Its Plan Clients
                  The Benefit Of Settlements It Reached With Other Clients. ............................... 24

III.     Plaintiffs' Prohibited Transaction Claim (Count III) Fails For Reasons Similar To
         Those Explained As To Count I................................................................................ 29

IV.      Plaintiffs Are Not Entitled To "Disgorgement" Of TFE Gains Because TIAA-
         CREF Did Not Profit From Its Handling Of TFE...................................................... 32

CONCLUSION.......................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*,
  861 F.2d 1406 (9th Cir. 1988) ..................................................................................33

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................................11

*D'Amico v. City of N.Y.*,
  132 F.3d 145 (2d Cir. 1998)....................................................................................11

*DMI Furniture, Inc. v. Brown, Kraft & Co.*,
  644 F. Supp. 1517 (C.D. Cal. 1986) .......................................................................20

*Dobson v. Hartford Fin. Servs. Grp.*,
  389 F.3d 386 (2d Cir. 2004)........................................................................20, 25, 26

*Donovan v. Bierwirth*,
  680 F.2d 263 (2d Cir. 1982)..............................................................................12, 31

*Duer Constr. Co. v. Tri-Cnty. Bldg. Trades Health Fund*,
  132 F. App'x 39 (6th Cir. 2005) ..............................................................................12

*Dupree v. Prudential Ins. Co. of Am.*,
  No. 99-8337-CIV, 2007 U.S. Dist. LEXIS 57857 (S.D. Fla. Aug. 7, 2007) ...........................30

*Faber v. Metropolitan Life Insurance Co.*,
  648 F.3d 98 (2d Cir. 2011)...........................................................................9, 21, 22, 29

*Fisher v. JP Morgan Chase & Co.*,
  469 F. App'x 57 (2d Cir. 2012)...............................................................................25

*Gambale v. Deutsche Bank AG*,
  377 F.3d 133 (2d Cir. 2004)....................................................................................28

*Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*,
  302 F.3d 18 (2d Cir. 2002).......................................................................................18

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) .............................................................................19, 29

*In re Citigroup ERISA Litig.*,
  662 F.3d 128 (2d Cir. 2011)....................................................................................18

*In re Halpin*,
  566 F.3d 286 (2d Cir. 2009)........................................................................21, 22, 29

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Jeffreys v. City of N.Y.*,
   426 F.3d 549 (2d Cir. 2005)..................................................................11

*John Blair Communications Profit Sharing Plan v. Telemundo Group, Inc.*,
   26 F.3d 360 (2d Cir. 1994)..................................................................26

*Johnson v. Ga. Pac. Corp.*,
   19 F.3d 1184 (7th Cir. 1994) .........................................................17, 25

*Jordan v. Mich. Conference of Teamsters Welfare Fund*,
   207 F.3d 854 (6th Cir. 2000) .........................................................30, 31

*LaRue v. DeWolff, Boberg & Assocs., Inc.*,
   552 U.S. 248 (2008)..........................................................................32

*Leigh v. Engle*,
   669 F. Supp. 1390 (N.D. Ill. 1985) .....................................................33

*McCabe v. Capital Mercury Apparel*,
   752 F. Supp. 2d 396 (S.D.N.Y. 2010)..............................................14, 26

*McCarthy v. Dun & Bradstreet Corp.*,
   482 F.3d 184 (2d Cir. 2007)..............................................................11

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993)..........................................................................31

*Mexican Nat'l R.R. Co. v. Davidson*,
   157 U.S. 201 (1895)..........................................................................21

*Morse v. Stanley*,
   732 F.2d 1139 (2d Cir. 1984)............................................................24

*O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
   642 F.3d 110 (2d Cir. 2011)..............................................................10

*O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*,
   37 F.3d 55 (2d Cir. 1994) .................................................................13

*Pegram v. Herdrich*,
   530 U.S. 211 (2000)......................................................................17, 18

*Pilkington PLC v. Perelman*,
   72 F.3d 1396 (9th Cir. 1995) .............................................................12

iii

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Assoc., Inc.*,
    814 F.2d 358 (7th Cir. 1987) ................................................................27

*Reich v. Compton*,
    57 F.3d 270 (3d Cir. 1995)...................................................................30

*S.E.C. v. Pentagon Capital Mgm't PLC*,
    844 F. Supp. 2d 377 (S.D.N.Y. 2012)....................................................16

*S. Ill. Carpenters Welfare Account v. Carpenters Welfare Account of Ill.*,
    326 F.3d 919 (7th Cir. 2003) ................................................................24

*Santomenno v. Transamerica Life Ins. Co.*,
    No. 12-02782, 2013 WL 603901 (C.D. Cal. Feb. 19, 2013) .................19

*SEC v. Variable Annuity Life Ins. Co. of Am.*,
    359 U.S. 65 (1959)...............................................................................19

*United States v. Glens Falls Newspapers, Inc.*,
    160 F.3d 853 (2d Cir. 1998)..................................................................28

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)....................................................................28

*Wright v. Nimmons*,
    641 F. Supp. 1391 (S.D. Tex. 1986) ......................................................12

*Wsol v. Fiduciary Mgmt. Assocs., Inc.*,
    266 F.3d 654 (7th Cir. 2001) ................................................................33

RULES

17 C.F.R. § 270.2a-4(a) ...............................................................................16

17 C.F.R. § 270.22c-1 ........................................................................... passim

Fed. R. Civ. P. 56(a) ..............................................................................1, 11

STATUTES

Investment Company Act of 1940, Pub. L. No. 76-768, 54 Stat. 789 (1940) (codified at
    15 U.S.C. §§ 80a-1-80a-64)..................................................................19

15 U.S.C. § 80a-22.............................................................................16, 22

29 U.S.C. § 1002................................................................................. passim

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

29 U.S.C. § 1101(b) ...................................................................................................19, 26, 29

29 U.S.C. § 1104(a) ...........................................................................................10, 11, 12, 26

29 U.S.C. § 1106(a)(1)(D) ......................................................................................10, 29

29 U.S.C. § 1109(a) ...............................................................................................32

29 U.S.C. § 1132(a)(2) ...........................................................................................32

**O**THER **A**UTHORITIES

H.R. Rep. No. 93-1280 (1974) (Conf. Rep.) ...................................................................18

Redeemable Secs. for Distribution, Redemption & Repurchase & Time-Stamping of
   Orders by Dealers, Investment Company Act Release No. 5519 (Oct. 16, 1968)...................16

*In re UBS Global Asset Mgmt. (Americas) Inc.*, Investment Company Act of 1940
   Release No. 29,920, Fed. Sec. L. Rep. (CCH) ¶ 89,702 (Jan. 17, 2012)................................16

Restatement (Second) of Trusts § 183 (1957) .................................................................24

Restatement (Third) of Trusts § 79 (2005) .....................................................................24

U.S. Dep't of Labor, Advisory Op. No. 97-15A (May 22, 1997)....................................31

Defendants[1] hereby respectfully move the Court, pursuant to Federal Rule of Civil Procedure 56(a), for summary judgment.

The central assertion underlying all of Plaintiffs' claims is that they were entitled to have their investments in TIAA-CREF variable annuity products redeemed at values greater than those dictated by the applicable prospectuses. Although those prospectuses expressly state that, for purposes of transfers and withdrawals, units of the variable annuities will be valued as of a specified effective date (*i.e.*, the date on which TIAA-CREF receives a transfer or withdrawal request or a later, agreed-upon date), Plaintiffs claim that they were also entitled under the Employee Retirement Income Security Act of 1974 ("ERISA") to any gain (but not any loss) in the value of the variable annuities between that effective date and the date on which their transactions were fully processed. That contention is as wrong as it sounds, and the Court has already rejected it as to Norman Walker, the original plaintiff in this case. The Court held that because Walker received the effective-date value of his investments within the seven-day period specified in the applicable prospectus, he received everything to which he was entitled.

Plaintiffs' transactions were not processed within the same seven-day window as Walker's, and they try to exploit that difference to distinguish their claims from his. But Plaintiffs do not allege that TIAA-CREF violated ERISA by taking more than seven days to process their transactions, nor do they seek any remedy tied to an alleged delay. Plaintiffs do not, for example, seek interest for the period of the alleged delay—TIAA-CREF has already paid them that. Nor do they seek any return they may have achieved through subsequent investments

---

[1]     Defendants are Teachers Insurance and Annuity Association of America, College Retirement Equities Fund, TIAA-CREF Investment Management, LLC, Teachers Advisors, Inc., and TIAA-CREF Individual and Institutional Services, LLC (collectively, "Defendants" or "TIAA-CREF"). Plaintiffs purport to name Teachers Insurance and Annuity Association of America - College Retirement Equities Fund as a defendant, but it is not a distinct legal entity, and the acronym TIAA-CREF is a trade name under which various TIAA- and CREF-affiliated entities do business. Separate Statement of Undisputed Facts In Support of Defendants' Motion for Summary Judgment ("SOF") ¶ 11.

had their requests been processed more quickly—they have, in fact, disclaimed any such remedy. Instead, Plaintiffs try to use the post-seven-day processing period to gain something to which they have no right under the prospectuses or any provision of ERISA—the value of the variable annuities on the processing date rather than the effective date, but only where the processing-date value is higher.

Although Plaintiffs seek this windfall under multiple theories, none of their three counts is sustainable as a matter of law.  Counts I and III assert, respectively, that TIAA-CREF violated the fiduciary duty of loyalty and engaged in prohibited transactions by failing to credit Plaintiffs with the gains in value that they now seek.  Both counts fail for two independent reasons.  First, there is no basis to conclude that TIAA-CREF's unitary practice for handling both gains and losses was structured to benefit anyone other than investors in its variable annuities, including Plaintiffs themselves.  Second, the gains at issue were not ERISA plan assets, and TIAA-CREF therefore had no fiduciary obligations in determining how to apply them.

The remaining count, Count II, alleges that TIAA-CREF breached a "duty of impartiality" by not giving Plaintiffs the same relief that CREF provided in a separate state-court settlement with a sub-set of its non-ERISA-plan investors.  The type of duty Plaintiffs describe, however, exists nowhere in ERISA.  CREF was not acting as an ERISA plan fiduciary—and so owed no ERISA fiduciary duty—when it entered into a private settlement with other investors. And CREF's settlement with a sub-set of investors who were differently situated than Plaintiffs does not entitle Plaintiffs here to similar relief, because the settlement did nothing to alter the terms of CREF's arrangements with Plaintiffs or their ERISA plans.  Nor could it, of course, alter the securities-law rules that drove TIAA-CREF's practices.

Accordingly, and for the reasons stated in greater detail below, Defendants are entitled to summary judgment as to Plaintiffs' claims in their entirety.

## BACKGROUND

### I.     The TIAA-CREF Entities.

Often referred to collectively under the trade name "TIAA-CREF," SOF ¶ 11, Defendants are, in fact, companion companies that provide products and services in the retirement market, SOF ¶¶ 1, 3-4, 12-16.  Teachers Insurance and Annuity Association of America ("TIAA") is an association founded as a philanthropic endeavor by the Carnegie Foundation for the Advancement of Teaching for the purpose of providing annuities and low-cost life insurance to college and university professors.  SOF ¶¶ 1-2.  Among the investment products that TIAA offers is a variable annuity known as the TIAA Real Estate Account.  SOF ¶ 3.  Defendant College Retirement Equities Fund ("CREF") is a nonprofit membership corporation and investment company registered under the Investment Company Act of 1940, with the stated purpose of aiding and strengthening nonprofit colleges and universities and other nonprofit institutions.  SOF ¶¶ 4-5.  CREF offers retirement investment options, including variable annuities, to investors.  SOF ¶¶ 4, 6.  During the class period,[2] CREF offered at least eight variable annuities—the Stock, Global, Growth, Equity Index, Bond Market, Inflation-Linked Bond, Social Choice, and Money Market Accounts (collectively, the "CREF Accounts").  SOF ¶ 6.  CREF has no employees, and its only assets are those held in its variable annuity products. SOF ¶¶ 8-9.  TIAA-CREF Individual and Institutional Services, LLC ("TIAA-Services"), a TIAA subsidiary, provided distribution and administrative services for both the CREF Accounts

---

[2]      The class period in this case is defined as August 17, 2003 through May 9, 2013.  ECF No. 306 at 19.

and the TIAA Real Estate Account for a portion of the class period, pursuant to various service agreements.[3]  SOF ¶¶ 13-15.

Consistent with TIAA's and CREF's stated missions and corporate purposes, neither TIAA nor TIAA-Services earns a profit under those services agreements; they are instead contractually obligated to operate both the CREF Accounts and TIAA Real Estate Account on an "at-cost" basis.  SOF ¶ 17.

## II.    The TIAA-CREF Variable Annuity Products.

Investors, including retirement plans, are able to participate in the CREF Accounts and the TIAA Real Estate Account (collectively, the "Accounts") by acquiring shares—known as accumulation units ("Units")—in the Accounts.  SOF ¶ 24.  Each of the Accounts, in turn, invests in underlying investments, such as stocks, bonds, and real estate.  SOF ¶¶ 3, 7.  Each Account's "net asset value" is determined every business day by calculating the aggregate value of the Account's underlying investments minus the expenses incurred in connection with that Account.  SOF ¶ 26.  The value of each Unit in an Account is generally determined by dividing the Account's net asset value by the number of Units held in the Account.  SOF ¶ 27.

Each Account has a prospectus that sets forth the rules governing an investor's participation in the Account.  SOF ¶ 28.  Investors receive a copy of the prospectus.  SOF ¶ 28.  Pursuant to those prospectuses, investors can submit requests to either withdraw the value of their investments as cash or have the value transferred to other Accounts or another company.  SOF ¶ 29.  Throughout the class period in this case, the applicable prospectuses for all of the Accounts have provided that such transfers and cash withdrawals are effective at the end of the

---

[3]    As of January 1, 2008, TIAA became responsible for providing the administrative services of the Real Estate Account.  SOF ¶ 16.  Similarly, as of January 1, 2009, TIAA became responsible for providing the administrative services of the CREF Accounts.  SOF ¶ 16.  TIAA-Services still provides certain distribution services for both the TIAA Real Estate Account and the CREF Accounts.  SOF ¶ 16.

business day on which TIAA-CREF receives the transfer request along with all required documents, or at the end of any agreed-upon future business day after the request and required documents are received (the "Effective Date"). SOF ¶¶ 30-31. The prospectuses have further specified that, to determine the amount to transfer or disburse, an investor's Units are to be valued as of that Effective Date. SOF ¶ 33. Likewise, the prospectuses state that for requests to purchase Units in an Account, TIAA-CREF calculates the value of the Units as of the end of the business day on which TIAA-CREF receives the purchase request in good order—*i.e.*, the Effective Date. SOF ¶ 36.

Nearly all transfer or withdrawal requests (other than requests for internal transfers to other TIAA-CREF products) are submitted to TIAA-CREF in writing via mail or facsimile, and thus require a period of time to process. SOF ¶ 38. Upon receiving a request, TIAA-CREF routes the request to the appropriate processing department, where the request is placed in a queue. SOF ¶ 39. A member of TIAA-CREF's processing team then reviews each piece of documentation submitted with the request, reconciles the information in the request with the account information in TIAA-CREF's system, and determines whether the request is "in good order"—*i.e.*, whether all documentation needed to process the request has been provided. SOF ¶ 40. Assuming the request is in good order, the processor executes the requested transaction, entering instructions into TIAA-CREF's recordkeeping system that trigger payment to the investor. SOF ¶ 41. The date on which this processing is completed is called the "Processing Date." SOF ¶ 42.

The prospectuses for the CREF Accounts provide that, in general, TIAA-CREF will make payments on transfer or withdrawal requests within seven days after the date on which TIAA-CREF receives the information it needs to process the request—*i.e.*, the Effective Date.

SOF ¶ 43.  The TIAA Real Estate Account prospectuses contain no provision that specifies any period of time within which transfers or withdrawals will be completed.  SOF ¶ 44.  Regardless, for both Accounts, the investor receives the value of the Units as of the Effective Date.  *See* SOF ¶¶ 33, 45.

## III.    Transactional Fund Earnings ("TFE").

Because the Accounts are valued on a daily basis, the per-unit value of an Account as of a transaction's Processing Date may be higher or lower than the per-unit value of the Account on the transaction's Effective Date.  SOF ¶ 45.  This difference in values is referred to as "Transactional Fund Earnings," "Transaction Fund Expense," or "TFE."  SOF ¶¶ 46-47. Because the prospectuses require that investors be paid the Effective-Date value of their Units, SOF ¶ 33, TFE has historically been recorded (or "ledgered") as "gains" or "losses" on accounts maintained by TIAA or TIAA-Services, SOF ¶¶ 47-48.  If an Account's net asset value increases between the Effective Date and Processing Date for a withdrawal or transfer transaction, the resulting TFE is recorded as a "gain."  SOF ¶ 48.  Conversely, if an Account's net asset value decreases between the Effective Date and Processing Date for a withdrawal or transfer, the resulting TFE is recorded as a "loss."  SOF ¶ 48.

At the end of each quarter, the recorded TFE "gains" and "losses" are netted against each other, and the result is included in the operating costs charged to the Accounts and incurred by all investors.  SOF ¶ 51.  If the total TFE gains are greater than the total TFE losses for a given quarter, operating costs for the Account are reduced by the amount of the net TFE gain; if the total TFE gains are less than the total TFE losses for a given quarter, operating costs will be higher.  SOF ¶ 52.  During the class period, investor transactions have produced a net TFE gain in some years and a net loss in others.  SOF ¶ 57.  Neither the TFE gains nor the TFE losses generated in connection with the Accounts are charged to or retained by TIAA, TIAA-Services,

CREF, or any other TIAA-CREF entity.  SOF ¶ 53.  Again, they form part of operating costs

chargeable to the Accounts and incurred by the Accounts' investors.  SOF ¶¶ 46, 51, 53.

Since at least May 2007, TIAA-CREF has explained this process in the prospectuses for

all of the Accounts.  SOF ¶¶ 55-56.  For example, the 2011 prospectus for the CREF Accounts

provides:

> Payments and orders to redeem accumulation units may be processed after
> the effective date.  "Processed" means when amounts are credited or debited to
> you in the Account.  In the event there are market fluctuations between the
> effective date and the processing date and the price of accumulation units on the
> processing date is higher or lower than your price on the effective date, that
> difference will be paid or retained by TIAA, the Accounts' administrator or by
> Services, the Accounts' distributor.  This amount, which may be positive or
> negative, together with similar amounts paid or retained by TIAA or Services in
> connection with transactions involving other investment products offered under
> pension plans administered by TIAA or its affiliates and the amount of interest,
> if any, paid by TIAA or Services to participants in CREF and other pension
> products in connection with certain delayed payments, is apportioned to CREF
> pursuant to two agreements: (i) an administrative services agreement with
> TIAA and (ii) a principal underwriting and distribution services agreement with
> Services.  Under these two agreements, CREF reimburses TIAA and Services
> for certain administrative and distribution services, respectively, which each
> entity provides to the Accounts.

SOF ¶ 56.

## IV.   Delayed-Payment Interest, Top-Up Payments, And Internal Transfers.

Although not required to do so under the terms of the prospectuses, TIAA-CREF has

historically paid "Delayed Payment Interest" ("DPI") to investors who submitted transfer or

withdrawal requests for which payment did not issue within seven days of the Effective Date.

SOF ¶ 61.  TIAA-CREF intended the DPI payments to compensate investors for the

inconvenience of the delay.  SOF ¶ 61.

In 2004, TIAA-CREF began to update its computer recordkeeping systems from the then-

existing Legacy system to a newer system, called Omni.  SOF ¶ 63.  The project involved

migrating and converting data from over 20,000 retirement plans with over 3.5 million

participants.  SOF ¶ 63.  This conversion delayed processing of a number of investors' transfer and withdrawal requests during the period from October 2005 through March 2008.  SOF ¶ 64. In 2008, TIAA-CREF responded by electing to make an additional, one-time "Top-Up" payment of DPI to investors who had made a withdrawal or transfer during that period and experienced a payment delay of greater than three (rather than seven) days.  SOF ¶ 66.

DPI, however, has not been paid in connection with "internal transfers"—transfers from one of the Accounts to another TIAA-CREF investment product.  SOF ¶ 70.  In the event of an internal transfer, the same Effective Date is used to determine both the value of the investor's Units in the first investment product and the price at which the investor acquires Units in the second investment product.  SOF ¶ 70.  Thus, investors initiating internal transfers experienced seamless market participation:  from the very time they ceased to experience market returns on the first investment product, they began experiencing market returns on the fund they were moving into—even if their transfers were not fully processed until days later.  *See* SOF ¶ 70.  As a result, any delay between the Effective Date and Processing Date of their transactions did not result in any inconvenience to them.

## V.    Plaintiffs.

The original plaintiff in this action was Norman Walker, a current or former participant in the St. Michael's College Retirement Plan (the "Plan"), which at one time offered Plan participants the ability to invest in Units of the Accounts.  SOF ¶¶ 85, 94; *see* Compl. (ECF No. 1).  In or around 2006, St. Michael's College decided to move the Plan recordkeeping and investments from TIAA-CREF to a different service-provider, Milliman USA ("Milliman"). SOF ¶ 86.  As part of the transfer process, St. Michael's College collected transfer forms from Plan participants and sent them on to TIAA-CREF for processing.  SOF ¶¶ 87-90.  Although TIAA-CREF received the individual transfer requests beginning on April 27, 2007, St. Michael's

College, Milliman, and TIAA-CREF agreed to use May 1, 2007 as the Effective Date for all of the Plan participants' transfer requests.  SOF ¶¶ 91-93.  TIAA-CREF received Walker's transfer request on April 27, 2007, and issued a check to Milliman on May 7, 2007, representing the value of Walker's Units in various CREF Accounts on the May 1, 2007 Effective Date.  SOF ¶ 95.  Walker sued, alleging that TIAA-CREF breached the fiduciary duty of loyalty under ERISA and engaged in prohibited transactions by not crediting him the TFE gains generated in connection with the transfer of his participant account to Milliman during the period from May 1 to May 7.  *See* Compl. (ECF No. 1).  On September 19, 2011, the Court granted TIAA-CREF's motion for summary judgment as to Walker's claims.  ECF No. 143 at 23-24.  Relying on the Second Circuit's decision in *Faber v. Metropolitan Life Insurance Co.*, 648 F.3d 98 (2d Cir. 2011), the Court concluded that Walker had received everything he was entitled to under the terms of the prospectus:  transfer of the Effective-Date value of his account within seven days of the Effective Date.  ECF No. 143 at 23-24; *see* ECF No. 186 at 3.

The current named plaintiffs, Carolyn Duffy and Christine Bauer-Ramazani ("Named Plaintiffs"), are or were also participants in the St. Michael's College Retirement Plan, SOF ¶ 94, and their participant accounts were transferred from TIAA-CREF to Milliman in May 2007, SOF ¶¶ 96-98, 100.  TIAA-CREF received Plaintiff Duffy's transfer request forms from St. Michael's College on April 27, 2007, and issued checks to Milliman by May 9, 2007 representing the value of her Units in Accounts on May 1, 2007.  SOF ¶¶ 96-97.  TIAA-CREF received Plaintiff Bauer-Ramazani's transfer request forms from St. Michael's College on May 17, 2007, and issued checks to Milliman on May 21, 2007 representing the value of her Units on May 1, 2007.  SOF ¶¶ 98, 100.  Duffy and Bauer-Ramazani both received DPI and Top-Up DPI payments in connection with their transfers.  SOF ¶ 69.

9

The Named Plaintiffs represent an opt-out class of Plaintiffs consisting of:

All persons, including all 'persons' as defined by 29 U.S.C. § 1002(9), who at any time during the [period of August 17, 2003 to May 9, 2013] requested a transfer or distribution of funds held in a CREF or TIAA variable annuity account covered by ERISA whose accounts were not transferred or distributed within seven days of the date the account was valued and were denied the investment gains.

ECF No. 327 at 2.

**VI.   Plaintiffs' Claims.**

Plaintiffs allege that TIAA-CREF violated its fiduciary duties and committed prohibited transactions under ERISA by using TFE gains to offset TFE losses and other Account expenses, rather than passing the TFE gains directly on to investors by valuing their Units at the higher Processing-Date amount.  Specifically, Plaintiffs assert that TIAA-CREF breached its duty of loyalty under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), "[b]y investing or keeping invested retirement funds belonging to Plaintiffs and others similarly situated for purposes other than their benefit for a period other than that permitted by the prospectus."  Consolidated 4th Amended Complaint ("4th Am. Compl.") (ECF No. 205) ¶ 43.  For essentially the same reason, Plaintiffs also allege that TIAA-CREF engaged in ERISA prohibited transactions in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).  4th Am. Compl. (ECF No. 205) ¶ 53.  In addition, Plaintiffs bring a claim for breach of the "duty of impartiality" under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), claiming that TIAA-CREF wrongfully "compensat[ed] certain customers but not others whose transfers or distributions were delayed for their lost investment experience."  4th Am. Compl. (ECF No. 205) ¶ 48.

STANDARD OF REVIEW

"[S]ummary judgment is warranted when 'the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.'"  *O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011)

(quoting *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003)); *see* Fed. R.

Civ. P. 56(a).  A fact is "material" when it "might affect the outcome of the suit under the

governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Jeffreys v. City

of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).  A "dispute about a material fact is 'genuine' . . . if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248.  "In ruling on a summary judgment motion, the district court must

resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor

of the party opposing summary judgment."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184,

202 (2d Cir. 2007) (internal quotation marks omitted).  Still, "[t]he non-moving party may not

rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence

showing that its version of the events is not wholly fanciful."  *D'Amico v. City of N.Y.*, 132 F.3d

145, 149 (2d Cir. 1998).

## ARGUMENT

### I.    Plaintiffs' Duty Of Loyalty Claim (Count I) Fails On At Least Two Levels.

Count I asserts that TIAA-CREF breached the duty of loyalty imposed under ERISA

§ 404(a)(1), 29 U.S.C. § 1104(a)(1).  Plaintiffs, however, do not contend that TIAA-CREF

breached that duty by processing their transfer requests more than seven days after the Effective

Date—the sole feature distinguishing their transactions from Walker's.  *See* ECF No. 256 at 3

n.2.  Instead, Plaintiffs contend that TIAA-CREF acted disloyally by not directly crediting them

with the value of TFE gains.  That claim fails in at least two basic ways, as (1) Plaintiffs cannot

prove that TIAA-CREF acted with an improper motive, and (2) TFE gains are not plan assets, so

TIAA-CREF could not have breached a fiduciary duty in handling them.

A.   **Plaintiffs' Duty Of Loyalty Claim Fails Because Plaintiffs Cannot Show That TIAA-CREF Acted With An Improper Motive To Benefit Itself Or Anyone Other Than ERISA Plans.**

By the terms of the statute itself, ERISA's duty of loyalty focuses on a fiduciary's motive or intent in carrying out its fiduciary duties.  29 U.S.C. § 1104(a)(1) (providing that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of:  (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan").  Thus, even assuming that TIAA-CREF acted as an ERISA fiduciary in applying TFE gains and losses (which it did not, *see infra* Part I.B.), Plaintiffs still must prove that TIAA-CREF acted with an impermissible motive—a motive to benefit someone other than its ERISA plan investors and their participants—when doing so.  *See Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982) (fiduciary duty of loyalty requires that decisions "be made with an eye single to the interests of the participants and beneficiaries," and there is no violation where fiduciaries "tak[e] action which, after careful and impartial investigation, they reasonably conclude best to promote the interests of participants and beneficiaries simply because it incidentally benefits the corporation or, indeed, themselves").[4]  Plaintiffs cannot meet that requirement, as the record evidence demonstrates that TIAA-CREF complied with federal securities law and the applicable Account prospectuses, and did so to the benefit of its ERISA plan investors, including Plaintiffs' plans.

---

[4]        *See also Duer Constr. Co. v. Tri-Cnty. Bldg. Trades Health Fund*, 132 F. App'x 39, 44 (6th Cir. 2005) ("The district court found that the Trustees *acted out of an improper motive* to advance union goals.  These fact findings . . . support the court's legal conclusion that the Trustees breached their duty of loyalty under § 1104(a)." (emphasis added) (internal quotation marks and citations omitted)); *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1401-02 (9th Cir. 1995) (reversing summary judgment for defendants on breach of loyalty claim, and stating that "[b]ecause the Revlon trustees' *motivation* may have deviated from that mandated by ERISA, summary judgment on the merits was improper" because there was some evidence that fiduciaries "were *motivated* by economic self-interest" (emphasis added)); *Wright v. Nimmons*, 641 F. Supp. 1391, 1402 (S.D. Tex. 1986) ("The duty of loyalty . . . is rooted in *intentional* tort law . . . .  In short, a fiduciary must not treat the trust res as if it were his own property; the fiduciary must not abuse his position of trust in order to advance his own selfish interests." (emphasis added)).

      **1.**     **TIAA-CREF's Handling Of TFE Gains And Losses Was Dictated By The Terms Of The Governing Prospectuses.**

TIAA-CREF's straightforward, neutral practice was to value Units at the Effective-Date price when processing transfer and withdrawal requests, and to offset TFE gains and losses against each other. SOF ¶¶ 33, 51. Sometimes this resulted in a net TFE loss, sometimes in a net TFE gain. SOF ¶¶ 50, 57. When the result was a net loss, TIAA-CREF passed the loss through to the Accounts as part of its "at-cost" contractual arrangement. SOF ¶¶ 51-52. When the result was a net gain, TIAA-CREF applied the gain to offset and reduce operating costs that would otherwise be charged to the Accounts and ultimately borne by the Accounts' investors, including Plaintiffs' plans. *See* SOF ¶ 52.

Plaintiffs' essential contention is that, rather than adopt this approach, TIAA-CREF should have applied TFE gains to adjust the amounts it credited participants in connection with withdrawals and transfers. But the decision not to apply TFE gains or losses in that manner cannot be attributed to an improper motive because Defendants were simply following the governing prospectuses. The practice of providing participants the Effective-Date value of their transactions—without regard to subsequent market fluctuations—was compelled by the Accounts' prospectuses, which the Plaintiffs' plans and their fiduciaries accepted by selecting the CREF and TIAA Real Estate Accounts as plan investment options. Those prospectuses uniformly provide that investors will receive the value of their investment as priced on the Effective Date when they request a transfer or withdrawal. SOF ¶ 33. That is the value Plaintiffs received. *See* SOF ¶¶ 93, 97, 100. TIAA-CREF cannot have acted disloyally merely by adhering to the governing documents it was required to follow. *Cf. O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 61 (2d Cir. 1994) (although "[t]he fiduciary duty of loyalty imposed by ERISA is designed to ensure that fund assets are held and administered for

the sole and exclusive benefit of plan participants," "ERISA does not require . . . that a fiduciary resolve every issue of interpretation in favor of the plan beneficiaries.  Indeed, a fiduciary must discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan.").[5]

## 2.   TIAA-CREF's Procedures For Handling TFE Gains And Losses Benefitted Plan Participants Such As Plaintiffs, Not TIAA-CREF.

In addition to being required by the Accounts' prospectuses, the practice of providing investors the Effective-Date value of the Accounts *benefitted* investors.  Although Plaintiffs focus their claims exclusively on those instances in which the value of the Accounts increased between the Effective Date and Processing Date of a transaction, those instances can only be identified in hindsight.  In practice, the Accounts' values could have just as easily decreased between those two dates—and often did.  *See* SOF ¶¶ 48-50, 57.  TIAA-CREF's prospectus-mandated approach allowed investors to decide how long to remain exposed to that downside risk.  Investors willing to bear the risk in hopes of an additional return could do so by waiting until a later date to request a transfer or withdrawal.  Investors who, on the other hand, no longer wished to invest in an Account could end their exposure to the risks of that Account immediately by locking in the Effective-Date value.  TIAA-CREF did not act disloyally in giving Plaintiffs and their plans that measure of control.

This is particularly so because TIAA-CREF's procedures were not designed to advantage—and did not advantage—TIAA-CREF or anyone else aside from the Plaintiffs' plans and other Account investors.  TIAA-CREF's procedures were facially neutral.  TIAA-CREF did not have one procedure for TFE gains and another for TFE losses; it treated them in the same

---

[5]    *Cf. also McCabe v. Capital Mercury Apparel*, 752 F. Supp. 2d 396, 407 (S.D.N.Y. 2010) (granting summary judgment for the defendant on ERISA plan-document-violation, loyalty, and prudence claims where the plan "not only condoned, but explicitly required" the valuation method defendants used when calculating distributions to participants).

way.  *See* SOF ¶¶ 48-49, 51-54.  And TIAA-CREF followed the same practice for withdrawals

and transfers, where a rising market would generate TFE gains, as it did for incoming

investments, for which that same market would generate TFE losses.  *See* SOF ¶¶ 48-49.  As a

result, it was impossible to know *ex ante* whether TIAA-CREF would experience a net TFE gain

or loss over time.  Indeed, in multiple years during the class period, transactions in the Accounts

produced net TFE losses.  SOF ¶ 57.  And, even where the process resulted in net TFE gains,

TIAA-CREF did not retain those gains for its own advantage, but instead applied them to reduce

the expenses borne by investors, including ERISA plans.  SOF ¶¶ 51-53.

Plaintiffs have nonetheless attempted to establish an impermissible motive for TIAA-

CREF's evenhanded practice by asserting that SEC Rule 22c-1 required TIAA-CREF *itself* to

bear any TFE losses.  Plaintiffs theorize that TIAA-CREF engaged in self-dealing by applying

TFE gains to offset those losses.  But this one-sided reading of SEC Rule 22c-1 contradicts its

plain language.  By its terms, SEC Rule 22c-1 *precludes* CREF from redeeming shares of its

securities at *any* price other than the Effective-Date value:

> No registered investment company issuing any redeemable security, no person
> designated in such issuer's prospectus as authorized to consummate transactions
> in any such security, and no principal underwriter of, or dealer in, any such
> security shall sell, redeem, or repurchase any such security *except at a price based
> on the current net asset value of such security which is next computed after
> receipt of a tender of such security for redemption or of an order to purchase or
> sell such security* . . . .

17 C.F.R. § 270.22c-1(a) (emphasis added).  Thus, the same logic that prohibits TIAA-CREF

from paying redeeming investors *less* than the Effective-Date value of their investments by

charging them TFE losses also precludes TIAA-CREF from paying redeeming investors *more*

than the Effective-Date value by crediting them with TFE gains and effectively pricing their

Units on the Processing Date.[6]  *See In re UBS Global Asset Mgmt. (Americas) Inc.*, Investment

Company Act of 1940 Release No. 29,920, Fed. Sec. L. Rep. (CCH) ¶ 89,702 (Jan. 17, 2012)

(order) (finding that Funds' redemption of shares "based on inaccurately high NAVs . . . violated

Rule 22c-1").  Rule 22c-1 permits—indeed compels—TIAA-CREF to pay investors *only* the

Effective-Date value of the redeemed securities—no less, and no more.[7]  That is precisely what

TIAA-CREF did, and it was not disloyal in doing so.

Yet, even if Plaintiffs' erroneous reading of the rule were correct, Plaintiffs' theory of

improper intent would still fail given the "at-cost" arrangement between TIAA and the Accounts.

TFE losses were part of the costs of operating the Accounts and so—to the extent not offset by

TFE gains—were charged through to the Accounts as part of the "at-cost" arrangements between

the Accounts and the relevant TIAA entities.  SOF ¶¶ 17, 51-53.  Under the terms of those

contractual arrangements and the Account prospectuses, the TIAA entities were entitled to pass

along the costs of providing services to the Accounts but were not allowed to collect any

additional amount as profit.  SOF ¶ 17.  Those costs, in turn, reduced the value at which Units in

the Accounts could be redeemed.[8]  *See* SOF ¶¶ 26-27.

---

[6]  The Rule is directed at thwarting market-timing strategies by which investors try to capitalize on mispricing; it achieves this aim by setting the net asset value at which shares will be sold or redeemed after the request to buy or sell shares has been received.  Pricing of Redeemable Secs. for Distribution, Redemption & Repurchase & Time-Stamping of Orders by Dealers, Investment Company Act Release No. 5519 (Oct. 16, 1968); *see S.E.C. v. Pentagon Capital Mgm't PLC*, 844 F. Supp. 2d 377, 390-92 (S.D.N.Y. 2012).  The Rule is therefore aimed at establishing a consistent and predictable method of valuing investment shares that so far as possible eliminates the potential for manipulation and gaming by investors.

[7]  Plaintiffs rely heavily on the fact that, in settling a state-court case, *Rink v. College Retirement Equities Fund*, CREF agreed to pay a sub-set of investors amounts equivalent to the TFE gains generated in connection with their transfers or withdrawals.  CREF's willingness and ability to pay an amount of compensation in the context of a court-approved settlement, however, says nothing about what CREF was required to do, or could do, as a matter of ordinary business practice, and nothing in the settlement exempted CREF or any other Defendant here from the application of Rule 22c-1.

[8]  As a matter of securities law, securities issued by an investment company must be sold and redeemed on the basis of their "net asset value," which is calculated by deducting a fund's operating expenses and fees from the current market value of the fund's portfolio of securities.  15 U.S.C. § 80a-22; 17 C.F.R. § 270.2a-4(a).

Thus, the use of TFE gains to offset TFE losses or other operating costs did not "benefit" TIAA-CREF.  TIAA-CREF was entitled to recover its costs regardless whether those costs were offset by TFE gains.  The use of TFE gains to offset operating costs instead benefitted investors—not TIAA-CREF—by enhancing the value of their investments.  Those investors, of course, have historically included Plaintiffs' plans, which benefitted from TIAA-CREF's handling of the TFE gains generated by transactions initiated by Account investors.  Thus, although the Account prospectuses and securities laws prevented TIAA-CREF from crediting TFE gains (or losses) to Plaintiffs or other investors directly, its practice nonetheless benefitted investors—including Plaintiffs during the time they were invested in the Accounts—rather than TIAA-CREF or anyone else.  Plaintiffs thus cannot show that TIAA-CREF acted with an impermissible motive, and Count I should be dismissed accordingly.[9]

### B.   No TIAA-CREF Entity Acted As An ERISA Fiduciary In Handling TFE Gains.

#### 1.   TFE Gains Are Not "Plan Assets."

Count I also fails because no TIAA-CREF entity acted as an ERISA fiduciary in handling TFE.  Someone who is a plan fiduciary as to one function is not necessarily a fiduciary with respect to other functions of the plan.  *See Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000); *see also Johnson v. Ga. Pac. Corp.*, 19 F.3d 1184, 1188 (7th Cir. 1994) ("[P]eople may be fiduciaries when they do certain things but be entitled to act in their own interests when they do

---

[9]     Nor, for that matter, can Plaintiffs demonstrate that TIAA-CREF acted disloyally in not processing Plaintiffs' transfers or withdrawals within seven days of the Effective Dates for their transactions.  For example, although TIAA-CREF did not process Named Plaintiff Duffy's transfer until eight days after the May 1, 2007 Effective Date for her transaction, there is no evidence that TIAA-CREF intentionally delayed the processing of that transaction, let alone that TIAA-CREF did so to benefit someone other than Duffy or the St. Michael's College Plan.  And TIAA-CREF could not have transferred Bauer-Ramazani's account within seven days after May 1, 2007, because it did not receive her request until May 17, 2007, well after that agreed-upon Effective Date.  SOF ¶ 98.  Bauer-Ramazani's request *was* processed within seven days of the date on which TIAA-CREF received it.  SOF ¶ 100.  Thus, Bauer-Ramazani's claim rests on the position that TIAA-CREF should not have used an Effective Date that preceded the receipt of her transfer request.  But there is no evidence that TIAA-CREF used the May 1 Effective Date for any reason other than to faithfully adhere to its agreement with the St. Michael's College Plan and Milliman.  *See* SOF ¶¶ 92, 99.

others.").  Rather, a person is a fiduciary under ERISA only "to the extent" that person performs fiduciary functions:

> Except as otherwise provided . . . , a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A); *see Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002) ("[A] person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only 'to the extent' that he has or exercises the described authority or responsibility." (internal quotation marks omitted)).  As a result, "[i]n every case charging breach of ERISA fiduciary duty, . . . the threshold question is . . . whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  *Pegram*, 530 U.S. at 226; *see In re Citigroup ERISA Litig.*, 662 F.3d 128, 135 (2d Cir. 2011).

Plaintiffs would ascribe fiduciary status to TIAA-CREF based on its handling of TFE. Plaintiffs appear to argue that TFE gains are "plan assets"—asserting, for example, that TFE gains constituted an increase in the value of their participant accounts.  *See, e.g.*, 4th Am. Compl. (ECF No. 205) ¶¶ 22, 24.  But that argument ignores the distinction between the assets of the Accounts and the securities (*i.e.*, the Units) in Plaintiffs' participant accounts.  ERISA, however, makes the distinction quite clear.  Recognizing that registered investment companies and their securities were already subject to an extensive statutory and regulatory scheme (the Investment Company Act of 1940), Congress crafted ERISA to avoid duplicating or interfering with that existing regime.  *See* H.R. Rep. No. 93-1280, at 296 (1974) (Conf. Rep.) ("Since mutual funds

18

are regulated by the Investment Company Act of 1940 and, since (under the Internal Revenue Code) mutual funds must be broadly held, it is not considered necessary to apply the fiduciary rules to mutual funds merely because plans invest in their shares.").

Consistent with that intent, ERISA § 401(b)(1) specifically provides that, when an employee-benefit plan governed by ERISA (such as the St. Michael's College plan) invests in securities (*i.e.*, the Units) issued by a registered investment company, the plan's assets consist *only* of those securities, and do not, by reason of that investment, include any of the underlying assets of the investment company.  29 U.S.C. § 1101(b)(1); *see Hecker v. Deere & Co.*, 556 F.3d 575, 584 (7th Cir. 2009); *see also Santomenno v. Transamerica Life Ins. Co.*, No. 12-02782, 2013 WL 603901, at *12 & n.13 (C.D. Cal. Feb. 19, 2013).  Relatedly, ERISA § 3(21)(B), 29 U.S.C. § 1002(21)(B), provides that when a plan invests in securities issued by a registered investment company—such as CREF—that investment does not by itself render the investment company or its adviser a fiduciary or party in interest[10] under ERISA.

ERISA § 401(b) applies directly to the CREF Accounts that constitute all but one of the variable annuity products at issue in this case.  CREF is a registered investment company under the Investment Company Act of 1940, SOF ¶ 5; Investment Company Act of 1940, Pub. L. No. 76-768, 54 Stat. 789 (1940) (codified at 15 U.S.C. §§ 80a-1-80a-64), and shares (*i.e.*, Units) in the variable annuity Accounts that it offers as investment options are securities, *see SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65 (1959).  Thus, with respect to the CREF Accounts, the plan assets held in Plaintiffs' participant accounts consisted only of those securities (*i.e.*, the Units) and nothing more.

---

[10]     ERISA § 3(14), 29 U.S.C. § 1002(14), defines "party in interest" to include nine categories of individuals and entities, including fiduciaries, plan service providers, and employers of employees covered by a plan.

### 2. Plaintiffs And Their Plans Had No Property Interest In Gains Beyond The Effective Date.

A security only gives a security-holder a limited set of contractual rights.  *See DMI Furniture, Inc. v. Brown, Kraft & Co.*, 644 F. Supp. 1517, 1523 (C.D. Cal. 1986) ("[I]nvestment 'securities' in whatever form represent the 'bundle of rights' which an investor receives back by contract from the person to whom he grants the managerial responsibility for his invested assets.").  Under securities law, those rights are set forth in the prospectus.  *See* SEC Form N-1A, Part A (outlining information required in investment fund's prospectus under Section 10(a) of the Securities Act); SOF ¶ 28.  The CREF Account prospectuses specifically state that investors transferring or withdrawing their Units are entitled to the Effective-Date value of those Units—nothing more.  SOF ¶ 33.  Thus, Plaintiffs and their plans had no right to any increase in the value of the Accounts beyond that date and therefore no property interest in TFE gains.  This Court, in fact, concluded as much when it granted summary judgment in TIAA-CREF's favor as to the claims asserted by original plaintiff Norman Walker, because "he received what the prospectus governing his accounts required."  ECF No. 186 at 3.

### 3. The Timing Of TIAA-CREF's Processing Of Transfer And Withdrawal Requests Creates No Property Rights In TFE.

The above analysis is unaffected by TIAA-CREF's alleged failure to process Plaintiffs' transfers or withdrawals within seven days of the Effective Date.  Although the CREF Account prospectuses state that, "in general," TIAA-CREF will make payment on transfers or withdrawals within seven days, SOF ¶ 43, nothing in the prospectuses remotely suggests that a failure to process transactions in that time frame gives investors a property interest in investment gains after the Effective Date.[11]

---

[11]     The Second Circuit has suggested that an implicit right to *interest* on delayed payments may be inferred from governing plan documents in the absence of express language, based on the time-value of money.  *Dobson v.*

As the Second Circuit explained in *In re Halpin*, 566 F.3d 286 (2d Cir. 2009), "[u]nder 'ordinary notions of property rights,' if a debtor fails to meet its contractual obligations to a creditor, the creditor does not automatically own a share in the debtor's assets.  The creditor, rather, has a 'chose in action,' an assignable contractual right to collect the funds owed by the debtor."  *Id.* at 290; *accord Mexican Nat'l R.R. Co. v. Davidson*, 157 U.S. 201, 206 (1895). "Accordingly, the unpaid amounts are debts; they are not assets held in trust for the benefit of the creditor."  *In re Halpin*, 566 F.3d at 290.  Following this logic, the Second Circuit held that, where an employer failed to make contributions to a plan in accordance with the plan's terms, that failure did not give the plan a property interest in the unpaid amounts.  *Id.* at 291.  In doing so, the Second Circuit pointed out that a contrary holding would automatically render employers who failed to pay amounts owed to ERISA plans in a timely manner fiduciaries—finding it "highly unlikely—indeed inconceivable—that Congress intended such a result."  *Id.*; *see Faber*, 648 F.3d at 105 (rejecting argument that once benefits become due and payable, a portion of the funds in insurer's general account equal to the benefits—and any profits the insurer made by investing those funds—become plan assets).

The logic of *In re Halpin* precludes Plaintiffs' fiduciary status theories in this case.  If, as Plaintiffs contend, TIAA-CREF failed to pay them the Effective-Date value of their Units in a timely manner, then Plaintiffs or their plans had, at most, a "contractual right to collect" those amounts.  *In re Halpin*, 566 F.3d at 290.  But Plaintiffs are not pursuing that chose in action. They have already received the amounts due to them under the applicable prospectuses, *see* SOF ¶¶ 33, 93, 97, 100, along with interest, SOF ¶¶ 61-62, 66-69, and have expressly disavowed any

---

*Hartford Fin. Servs. Grp.*, 389 F.3d 386, 402 (2d Cir. 2004).  Here, however, TIAA-CREF has already paid delayed payment and top-up interest to the Named Plaintiffs and to any other investors who may have been inconvenienced by a delay between the Effective and Processing Dates of their transfers or withdrawals.  SOF ¶¶ 61-62, 66-69. Plaintiffs can point to no prospectus provision suggesting a right to the more extreme remedy they now seek.

claim that a delay in paying those amounts was an ERISA violation, ECF No. 256 at 3 n.2. Instead, Plaintiffs are seeking to use the alleged existence of a delay as an excuse to convert into plan assets amounts that never belonged to them, and were never promised to them. As the Second Circuit explained in *In re Halpin*, that leap is inconsistent with trust law and ordinary notions of property rights. 566 F.3d at 290-91. And, if accepted, it would convert into an ERISA fiduciary any registered investment company, including any mutual fund, that makes an untimely payment to an ERISA plan investor, a result that is "highly unlikely—indeed inconceivable—that Congress intended," in light of ERISA §§ 3(21)(B) and 401(b)(1). Indeed, the intrusion of ERISA's fiduciary rules into the governance of investment companies would be particularly inappropriate here given that the provisions in the CREF Account prospectuses addressing how Units will be valued for purposes of transfers and withdrawals were derived from federal securities law. SOF ¶ 34; *see* 15 U.S.C. § 80a-22(e); 17 C.F.R. § 270.22c-1. Plaintiffs' effort to establish fiduciary liability based on TIAA-CREF's handling of TFE generated in connection with the CREF Accounts should thus be rejected.

Similar logic compels the same result for the TIAA Real Estate Account. Although that Account is not subject to ERISA § 401(b)(1), the Second Circuit has held that, in the absence of a specific provision such as ERISA § 401(b)(1), whether an asset is a "plan asset" is determined by ordinary notions of property rights, taking into account "any contract or other legal instrument involving the plan . . . ." *Faber*, 648 F.3d at 105 (citing U.S. Dep't of Labor, Advisory Op. No. 93–14A (May 5, 1993)). As with the CREF Accounts, the prospectuses for the TIAA Real Estate Account give investors a right to the per-unit value of the Account on the Effective Date, *see* SOF ¶ 33, which is precisely what Plaintiffs received. And nothing in the prospectuses purports to give investors a property interest in something more than that Effective-Date value if

some deadline is passed.[12]  Indeed, Plaintiffs' claim is all the weaker because the TIAA Real

Estate Account prospectuses do not even arguably establish a deadline for TIAA-CREF to

process a transfer or withdrawal request—they do not contain the seven-day language found in

the CREF Account prospectuses or any other timing guideline.  SOF ¶ 44.  Thus, in receiving the

Effective-Date value of the Real Estate Account, Plaintiffs received everything that they were

entitled to under that Account's prospectuses.  *See* ECF No. 143 at 23-24.

    In sum, because the Account prospectuses did not give Plaintiffs or their plans a property

interest in anything beyond the Effective-Date value of their investments, TFE—which

represents a change in the value of the Accounts *after* the Effective Date—was not a plan asset,

and TIAA-CREF's practice of not paying to investors TFE gains generated in connection with

their transfer and withdrawal requests cannot give rise to fiduciary liability under ERISA.  For

this additional reason, TIAA-CREF is entitled to summary judgment as to Count I.[13]

---

[12]    Nor, by that token, have Plaintiffs pointed to any other document purportedly giving them such an interest.
Although Plaintiffs allege that the St. Michael's College Plan documents "neither state nor suggest that TIAA-CREF
may use or retain investment earnings on funds from a retirement account after the good order date, or that it may
invest or keep such funds invested for any purpose other than the account holder's benefit," they do not point to any
term or requirement in the St. Michael's College Plan documents—much less in the plan documents for all the other
plans implicated by Plaintiffs' class—that would entitle them to TFE gains.  4th Am. Compl. (ECF No. 205) ¶ 26.

[13]    The unreasonableness of treating Plaintiffs' plans as having a property interest in TFE gains is particularly
striking in the case of internal transfers, where investors transferred their investments from one TIAA-CREF
Account to another.  In those instances, under the terms of the Account prospectuses, the Effective Date applied to
calculate the value of the Units being transferred from the first Account is the same date used to calculate the value
of the Units purchased in the second Account.  SOF ¶ 70.  In other words, from the very point the investor ceased to
experience the investment gains and losses of the first Account, the investor began to experience the gains and losses
of the second.  Thus, to accept that an investor engaging in an internal transfer continued to have a right to
investment gains in the old Account after the Effective Date would mean that the investor was entitled to the
investment returns of two Accounts for the same invested money during the same timeframe.  Nothing in ERISA
entitles an investor to two returns on the same investment.

## II.     Plaintiffs' Duty of Impartiality Claim (Count II) Fails For Multiple Reasons.

### A.     ERISA Imposes No Duty Requiring TIAA-CREF To Give Its Plan Clients The Benefit Of Settlements It Reached With Other Clients.

Count II asserts that TIAA-CREF also breached a so-called "duty of impartiality" by not providing Plaintiffs' plans the same type of relief that CREF has paid in settlement with a sub-set of its other investors.  *See* 4th Am. Compl. (ECF No. 205) ¶ 48.  Plaintiffs have pointed, in particular, to the Kentucky state-court case captioned *Rink v. College Retirement Equities Fund*, in which CREF entered into a settlement, agreeing to pay unrelated, non-ERISA investors an amount equivalent to the TFE gains related to the transfers or distribution of their individual accounts.[14]  *See* ECF No. 224 at 4 (citing ECF No. 224, Ex. 1 (filed under seal) ¶ 30 (describing *Rink* settlement)).  But there is no such "most favored nation" provision in ERISA, and Plaintiffs' efforts to fashion one are meritless.

Courts have recognized that, in administering an ERISA plan, fiduciaries have a duty to treat participants and beneficiaries of the plan evenhandedly.  *See, e.g.*, *Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir. 1984); *S. Ill. Carpenters Welfare Account v. Carpenters Welfare Account of Ill.*, 326 F.3d 919, 923-24 (7th Cir. 2003).  This ERISA "duty of impartiality" is grounded in the trust-law principle that, "[w]hen there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them."  Restatement (Second) of Trusts § 183 (1957); *see* Restatement (Third) of Trusts § 79 (2005).  But neither that principle nor any ERISA

---

[14]     In their Fourth Amended Complaint, Plaintiffs refer to this form of compensation as payment for "lost investment experience."  *See* ECF No. 205 ¶¶ 29, 35, 48.  But Plaintiffs use the *Rink* class as their point of comparison, and that class was not paid true "lost investment experience"—what they would have earned if invested in *new* funds had their money been transferred by TIAA-CREF more quickly.  Instead, the *Rink* plaintiffs were all paid compensation based on what their funds would have earned if they had remained in the market through the TIAA-CREF Accounts during the same period—the difference between the Effective-Date and Processing-Date values of the Accounts.  Plaintiffs have represented that they are *not* seeking the value they would have earned if they had been in the market in their post-transfer investment options sooner.  ECF No. 224 at 6 ("TIAA-CREF appears to assume that Plaintiffs are seeking to recover what their funds would have earned at Milliman if they had been timely transferred.  They are not.").

provision requires entities that offer products and services to an ERISA plan to deal with the plan and its participants on precisely the same terms on which they deal with all other clients. *See Dobson v. Hartford Fin. Servs. Grp.*, 389 F.3d 386, 402 (2d Cir. 2004) ("The fact that on a few occasions [the defendant insurer] paid interest on an *ex gratia* basis to shore up important business relationships was not material to plaintiff's claim that the Plan provides an obligation to pay interest."). And ERISA certainly does not provide that a party that enters into a settlement with one set of customers or investors must automatically extend the same relief to all of its other investors who happen to be ERISA plans.

As an initial matter, settling a lawsuit does not constitute a fiduciary act under ERISA. CREF, the sole settling defendant in *Rink,* was not acting as a fiduciary of Plaintiffs' plans when it litigated and resolved that case, and so did not owe the Plaintiffs' plans any fiduciary duties in determining whether or on what terms to settle. *See Fisher v. JP Morgan Chase & Co.*, 469 F. App'x 57, 60 (2d Cir. 2012) (summary order) (defendants did not breach duty of loyalty because they were acting in a corporate, rather than ERISA fiduciary capacity, when they took the action plaintiffs complained about) (citing *Gearren v. McGraw-Hill Cos.*, 660 F.3d 605, 611 (2d Cir. 2011) (per curiam)); *Johnson*, 19 F.3d at 1199. CREF's only role with respect to Plaintiffs' plans was that of a registered investment company offering securities to investors, including ERISA plans. As a matter of law, that is not an ERISA fiduciary function. 29 U.S.C. § 1002(21)(B).

But even if Plaintiffs could establish—and they cannot—that CREF had *some* ERISA fiduciary responsibilities towards their plans, they still could not establish that CREF was acting as an ERISA fiduciary in settling *Rink* because nothing in that settlement remotely involved the Plaintiffs' plans or those plans' assets. The plaintiff in *Rink* did not sue CREF in CREF's

25

capacity as a fiduciary or representative of any plan.  Rather, he sued CREF in its corporate

capacity.  *See* SOF ¶ 71.  By definition, the *Rink* class consisted exclusively of non-ERISA plans

and investors.  SOF ¶ 74.  And there is no allegation or evidence that CREF used anything other

than its assets (again, not plan assets, *see* 29 U.S.C. § 1101(b)(1)) to fund its settlement in that

case.  Because CREF was not acting as a fiduciary to Plaintiffs' plans, it cannot be held liable

under ERISA's fiduciary rules for settling the *Rink* case.[15]

Nor is there any legal basis to conclude that CREF's decision to settle the *Rink* case in

any way altered TIAA-CREF's obligations to Plaintiffs or their plans under ERISA.  *Dobson*,

389 F.3d at 402 (concluding that insurer's payment of interest on delayed payments to other

insureds for business reasons was not material to plaintiff's claim that the plaintiff's plan

imposed an obligation to pay interest to him).  As discussed, Plaintiffs cannot establish that

CREF itself held any fiduciary role with respect to their plans.  And, although certain TIAA

entities may have had some fiduciary responsibilities, ERISA expressly requires that fiduciaries

adhere to the terms of a plan's governing instruments as they are written when making decisions

about plan administration.  29 U.S.C. § 1104(a)(1)(D) (an ERISA fiduciary shall discharge his

duties "in accordance with the documents and instruments governing the plan").

Accordingly, any obligations that TIAA-CREF owed to Plaintiffs and their plans—

fiduciary or otherwise—were set by the plans' governing instruments and contracts, including

the Account prospectuses.  *See* ECF No. 186 at 3 (explaining that Walker's claims were

dismissed because "he received what the prospectus governing his accounts required"); *McCabe*,

752 F. Supp. 2d at 407 (granting summary judgment for defendants where "Plan not only

---

[15]     This distinguishes this case from *John Blair Communications Profit Sharing Plan v. Telemundo Group, Inc.*, 26 F.3d 360 (2d Cir. 1994), on which Plaintiffs relied in their class certification papers.  *See* ECF No. 224 at 4-5.  In that case, the court held that, where a fiduciary acted as a "dual fiduciary" of two plans on different ends of the same transaction, the fiduciary "owed distinct duties to both" and "could not grant preferences as between the two."  26 F.3d at 370.

condoned, but explicitly required" method of valuation used by defendants).  Nothing in the *Rink*

settlement remotely suggests that the Account prospectuses—or any other plan-related

documents—are susceptible to any reading other than the straightforward interpretation that

TIAA-CREF applied in valuing Units on the Effective Date.  To the contrary, the *Rink* settlement

agreement specified that CREF was not acknowledging any fault, liability, or wrongdoing of any

kind but was instead merely making a settlement payment to avoid the continued burdens and

expense of litigation.  SOF ¶ 77.  Nothing in the *Rink* settlement can be construed to require

TIAA-CREF to pay to investors, outside the context of settlement, more than the Effective-Date

value required by the Account prospectuses.

Indeed, if accepted, Plaintiffs' theory would fundamentally alter the terms of that court-

approved class settlement.  Among the terms of that settlement was a class definition, the

purpose of which, of course, was to define precisely the individuals whose rights would be

determined by the settlement.  *See* SOF ¶ 74.  The settlement, moreover, offered class members

the ability to opt out of the settlement and have their rights as to CREF remain unaffected.  SOF

¶ 76; *cf. Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Assoc., Inc.*, 814 F.2d 358, 362

(7th Cir. 1987) ("Someone who opted out could take his chances separately, but the separate suit

would proceed as if the class action had never been filed.").  Plaintiffs' theory, if credited, would

nullify these material settlement terms, and it would do so in a grossly one-sided fashion.  Under

Plaintiffs' theory, TIAA-CREF was obligated to offer the same relief to all investors, regardless

of whether those investors fell outside the class definition.  But TIAA-CREF only received

releases from the actual *Rink* class members.  *See* SOF ¶ 75.  Thus, Plaintiffs' essential

contention is that they were entitled to *better* terms than the *Rink* class members, in that, under

27

their theory, Plaintiffs should have received all of the benefits of the *Rink* settlement while assuming none of the obligations.

Moreover, if accepted, Plaintiffs' position would dramatically undermine the ability of TIAA-CREF and other fund companies to reach rational compromises with complaining investors and customers—contrary to the well-established judicial policy favoring settlement. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (noting the "strong judicial policy in favor of settlements, particularly in the class action context"); *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 143 (2d Cir. 2004) (observing that "courts are bound to encourage" the settlement of litigation); *United States v. Glens Falls Newspapers, Inc.*, 160 F.3d 853, 856-57 (2d Cir. 1998) ("Where a case is complex and expensive, and resolution of the case will benefit the public, the public has a strong interest in settlement.  The trial court must protect the public interest, as well as the interests of the parties, by encouraging the most fair and efficient resolution.").  It would greatly increase the costs of settlement to defendants in general by forcing them to incur substantial expenses beyond the relief provided to the plaintiffs in a given case.  But it would provide no additional value to those plaintiffs and would do nothing to enable them to offer greater consideration in return; the plaintiffs would still only be able to offer releases for themselves and participating class members.[16]  This imbalance would render infeasible settlements that would be economically rational if limited to the parties actually involved in the litigation.  Nothing under ERISA compels or justifies this illogical and inefficient result.

---

[16]     For example, if Plaintiffs' theory were taken seriously, TIAA-CREF could only settle the current litigation by agreeing to provide relief not only to the class members, but also to any investors who elect to opt out of the class and to any non-ERISA investors who were not covered by the *Rink* settlement—including individuals whose contracts were not covered by New York law or whose transactions occurred outside the *Rink* class period.  *See* SOF ¶ 74.  That additional relief would bestow no additional benefit on Plaintiffs, and Plaintiffs would have no ability to offer releases on behalf of those other individuals as consideration.

Accordingly, Defendants are entitled to summary judgment as to Count II.

### III.    Plaintiffs' Prohibited Transaction Claim (Count III) Fails For Reasons Similar To Those Explained As To Count I.

Count III asserts that TIAA-CREF invested "amounts in the retirement accounts of Plaintiffs" for "more than seven days following the Effective Date" for purposes other than the benefit of Plaintiffs.  4th Am. Compl. (ECF No. 205) ¶ 53.  Plaintiffs contend that, by allegedly doing so, TIAA-CREF violated ERISA § 406(a)(1)(D), which prohibits a fiduciary from causing transactions that the fiduciary knows or should know constitute a "use by or for the benefit of a party in interest of any assets of the plan."  4th Am. Compl. (ECF No. 205) ¶ 52 (quoting 29 U.S.C. § 1106(a)(1)(D)).

Count III fails at its premise because TIAA-CREF did not invest any "amounts in the retirement accounts of Plaintiffs" after the respective Effective Dates of their transfers and withdrawals.  As discussed *supra* at Part I.B., Plaintiffs' participant accounts held securities entitling them to the per-Unit value of the Accounts as of the Effective Date—nothing more and nothing less.  Those securities offered the security-holder no right to a further investment gain beyond that Effective-Date value.  And, as Plaintiffs have stressed, they exposed the security-holder to no further investment risk, because Rule 22c-1 precludes TIAA-CREF from paying less than the Effective-Date value.  *See* ECF No. 224, Ex. 1 (filed under seal) ¶ 14.  The most that remained invested after the Effective Date were the underlying assets of the Accounts.  But, as a matter of law, those underlying assets were not plan assets.  *See* 29 U.S.C. § 1101(b)(1); *Hecker*, 556 F.3d at 584; *In re Halpin*, 566 F.3d at 290-91; *Faber*, 648 F.3d at 105.  In receiving the Effective-Date value of their Units, Plaintiffs and their plans—and they alone—received the full value of their securities.  Accordingly, TIAA-CREF cannot be held to have invested or "used"

the assets of Plaintiffs' plans for anyone other than those plans and their participants.  That alone is enough to dispense with Count III.

Yet, even if TIAA-CREF could somehow be said to have "invested" plan assets between the Effective and Processing Dates of Plaintiffs' transactions, Defendants would still be entitled to summary judgment on Count III because Plaintiffs cannot establish that TIAA-CREF intended its TFE practice to benefit a party in interest, as they must to prove a claim under ERISA § 406(a)(1)(D).[17]  As previously discussed, the practice that Plaintiffs challenge was dictated by the terms of the Account prospectuses, which require TIAA-CREF to provide investors the Effective-Date value of their investments while recognizing that payment of that value may not occur until days later.  *See supra* Part I.A.1.  And there is no evidence that TIAA-CREF adopted its practice for any purpose other than complying with those governing prospectus terms.

Further, there is no evidence that TIAA-CREF knew or should have known that its practice would benefit a party in interest.  Plaintiffs focus in hindsight on those instances in which the value of the Accounts increased between an Effective Date and Processing Date.  In fact, however, Defendants had a unitary practice that applied in the event of both TFE gains and losses and extended both to transfers and withdrawals and to incoming investments.  SOF ¶¶ 48-54.  That practice could just as easily result in a net TFE loss as a net gain, and in many years did.  SOF ¶¶ 50, 57.  Thus, as discussed above, there was no way for TIAA-CREF to know on an *ex ante* basis whether its practice would benefit or burden the party bearing the consequences of TFE.

---

[17]     *See Jordan v. Mich. Conference of Teamsters Welfare Fund*, 207 F.3d 854, 860-61 (6th Cir. 2000) (holding that ERISA § 406(a)(1)(D) requires proof of subjective intent to benefit a party in interest); *Reich v. Compton*, 57 F.3d 270, 279 (3d Cir. 1995) ("In ordinary usage, if something is done 'for the benefit of' x, it is done for the purpose of benefitting x."); *Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337-CIV, 2007 U.S. Dist. LEXIS 57857, at *124-25 (S.D. Fla. Aug. 7, 2007) ("The case law . . . suggests that a 'transfer' or 'use' is prohibited as being 'for the benefit' of a party in interest only if the purpose of such transfer or use is to benefit the party in interest.").

Even if TIAA-CREF could have predicted a net TFE gain over time, Plaintiffs cannot show that the parties who received the benefit of that gain were parties in interest with respect to Plaintiffs' plans.  Although TFE gains and losses were recorded (or "ledgered") in the first instance on accounts maintained by TIAA or TIAA-Services, SOF ¶ 47, any TFE gains generated in connection with the Accounts were offset against TFE losses and other operating costs otherwise chargeable to the Accounts and borne by their investors, SOF ¶¶ 51-53.  Because TIAA and TIAA-Services were precluded by contract from retaining TFE gains as additional compensation, they did not "benefit" from those gains.[18]  Rather, the beneficiaries of any TFE gains were the Account investors—which historically included Plaintiffs—who benefitted in the form of lower Account costs and correspondingly higher Account values.  Plaintiffs have not alleged, and cannot establish, that those other investors were "parties in interest" to their plans within the meaning of ERISA.  *See* 29 U.S.C. § 1002(14) (defining "party in interest" to include only certain types of entities and individuals); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251-52 (1993) (holding that term "party in interest" must be strictly construed); *Jordan v. Mich. Conf. of Teamsters Welfare Fund*, 207 F.3d 854, 858-59 (6th Cir. 2000) (same); *see also Donovan*, 680 F.2d at 270 (specific prohibitions in ERISA Section 1106 should not be given "expansive interpretation").  Accordingly, because Plaintiffs cannot demonstrate that TIAA-CREF's practice benefitted parties in interest to their plans, much less that TIAA-CREF intended it to do so, TIAA-CREF is entitled to summary judgment as to Count III.

---

[18]     *Cf.* U.S. Dep't of Labor, Advisory Op. No. 97-15A (May 22, 1997) ("[B]ecause Frost's trustee agreements with the Plans are structured so that any 12b-1 or subtransfer agent fees attributable to the Plans' investments in mutual funds are used to benefit the Plans, either as a dollar-for-dollar offset against the fees the Plans would be obligated to pay to Frost for its services or as amounts credited directly to the Plans, it is the view of the Department that Frost would not be dealing with the assets of the Plans in its own interest or for its own account, or receiving payments for its own personal account in violation of section 406(b)(1) or (b)(3).").

**IV.    Plaintiffs Are Not Entitled To "Disgorgement" Of TFE Gains Because TIAA-CREF Did Not Profit From Its Handling Of TFE.**

All of Plaintiffs' claims also fail because the remedy that Plaintiffs are seeking—the "disgorgement" of TFE gains they allege were improperly retained by TIAA-CREF—is tied to the false premise that TIAA-CREF retained or profited from these TFE gains, which it did not. Plaintiffs' claims are principally brought under ERISA § 502(a)(2), which authorizes plan participants to bring a "civil action . . . for appropriate relief" for fiduciary breaches under ERISA § 409.  29 U.S.C. § 1132(a)(2); *see LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 252 (2008).  Section 409, in turn, provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate . . . ."  29 U.S.C. § 1109(a). To fit within this framework, Plaintiffs have asserted that they are seeking "disgorgement of investment gains earned on their funds between the Effective Date and Processing Date."  ECF No. 224, Ex. 1 (filed under seal) ¶ 40; *see* ECF No. 224 at 8.  And they have made clear that they are not seeking any alternative measures of damages, such as the returns they could have earned had they invested sooner in the options they selected after their transfer from TIAA-CREF was completed.  ECF No. 224 at 6.[19]

---

[19]    In their operative complaint, Plaintiffs also reference ERISA § 502(a)(3), a "catchall provision" that offers remedies in addition to those specifically enumerated elsewhere.  *See, e.g.*, ECF No. 205 at 13.  But the Supreme Court has explained that "relief is not 'appropriate' under 502(a)(3) if another provision . . . offers an adequate remedy."  *LaRue*, 552 U.S. at 258 (citing *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996)).  Thus, because § 502(a)(2) specifically provides for the equitable remedy of disgorgement of profits resulting from an alleged fiduciary breach to a plan, it is *that* provision under which the claims Plaintiffs are pressing are properly brought, and § 502(a)(3) does not provide an alternate path to recovery.

But, by the terms of the statute itself, the equitable "remedy of disgorgement is limited to cases in which the breach of the fiduciary obligation enables the fiduciary to make a profit 'through [the fiduciary's] use of assets of the plan.'" *Wsol v. Fiduciary Mgmt. Assocs., Inc.*, 266 F.3d 654, 658 (7th Cir. 2001) (quoting 29 U.S.C. § 1109(a)). "If no misuse of the funds occurs, if no losses are incurred or profits obtained that differ from what they would have been had there been no breach of fiduciary duty, there is no remedy." *Id.*; *see Leigh v. Engle*, 669 F. Supp. 1390, 1404-05 (N.D. Ill. 1985) (finding no disgorgement required because no profits arose through use of plan assets), *aff'd*, 858 F.2d 361 (7th Cir. 1988). This makes sense, as "[t]he abuse or misuse of plan assets for the benefit of a fiduciary is . . . the type of abuse ERISA was enacted to redress and prevent." *Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1415 (9th Cir. 1988). Where no such misuse for the benefit of the fiduciary occurs, ERISA's structure recognizes that there is nothing to "disgorge."

Thus, even if Plaintiffs could show that TIAA-CREF breached its fiduciary obligations (which, for the reasons explained above, they cannot), Plaintiffs would still not be entitled to any recovery as a matter of law because no TIAA-CREF entity retained or profited from any TFE gains associated with the Accounts. As previously discussed, any TFE gains were applied to offset and reduce TFE losses and other operating costs incurred in connection with the Accounts. This use of TFE gains did nothing to benefit or profit any TIAA-CREF entity because those costs, whether offset by TFE gains or not, were fully chargeable to the Accounts.[20] Thus, if anyone "profited" from TIAA-CREF's application of TFE gains, it was the Accounts'

---

[20] Plaintiffs have attempted to muddy this fact by emphasizing that TIAA-CREF's operating costs included the salaries of TIAA employees, including executives. But those salaries were an *expense* to TIAA-CREF, not a profit, and are not something TIAA-CREF has to disgorge. *See* SOF ¶ 18. Further, there is no evidence that the amounts of those salaries were at all affected by the existence or amount of TFE gains. SOF ¶¶ 19-20, 54.

33

investors—including Plaintiffs—who received the benefit of lower costs.  There are simply no profits for TIAA-CREF to disgorge.

## CONCLUSION

For the reasons above, Defendants respectfully submit that they are entitled to summary judgment on each of Plaintiffs' claims.

Dated:  June 14, 2013                                O'MELVENY & MYERS LLP

By: /s/ Shannon M. Barrett
Shannon M. Barrett (*pro hac vice*)
Mary Patrice Brown (*pro hac vice*)
Theresa S. Gee (*pro hac vice*)
Diana Roman Shaw (*pro hac vice*)
1625 Eye Street, N.W.
Washington, D.C. 20006
Phone: (202) 383-5300
Fax:    (202) 383-5414
E-mail:  sbarrett@omm.com


By: /s/ Potter Stewart, Jr.
Potter Stewart, Jr.
POTTER STEWART, JR. LAW OFFICES P.C.
The Merchants Bank Building
205 Main Street, Suite 8
Brattleboro, VT 05301
Phone: (802) 257-7244
E-mail:  pstewart@potterstewartlaw.com


*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT**


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 14, 2013, I electronically filed Defendants' Motion for

Summary Judgment, Separate Statement of Undisputed Facts (Redacted), and the Declarations of

Peter Case and Theresa S. Gee with the Clerk of the Court using the CM/ECF system, which will

send notification of such filing to the following:


Norman Williams
Robert B. Hemley
GRAVEL & SHEA PC
76 St. Paul Street, 7th Floor, P.O. Box 369
Burlington, CT 05402-0369
(802) 658-0220
nwilliams@gravelshea.com
rhemley@gravelshea.com

Thomas A. Tucker Ronzetti
Kenneth Hartmann
KOZYAK TROPIN & THROCKMORTON, PA.
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
tr@kttlaw.com
krh@ttlaw.com

*Attorneys for Plaintiffs*

/s/   Shannon M. Barrett_____