UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

CHRISTINE BAUER-RAMAZANI and )
CAROLYN B. DUFFY, on behalf of )
themselves and all others similarly situated, )
                Plaintiffs )
   )
    v. )     Docket No. 1:09-CV-190
   )
TEACHERS INSURANCE AND ANNUITY )
ASSOCIATION OF AMERICA – COLLEGE )
RETIREMENT AND EQUITIES FUND )
(TIAA-CREF), COLLEGE RETIREMENT )
AND EQUITIES FUND (CREF), TEACHERS' )
INSURANCE AND ANNUITY ASSOCIATION )
OF AMERICA (TIAA), TIAA-CREF )
INVESTMENT MANAGEMENT, LLC (TCIM), )
TEACHERS ADVISORS, INC. (TAI), and )
TIAA-CREF INDIVIDUAL & INSTITUTIONAL )
SERVICES, LLC, )
              Defendants )

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DOC. 341)

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

Preliminary Statement

Plaintiffs brought this action after TIAA-CREF did not pay them the value of their fund shares on the date it processed their transfer orders, contrary to the St. Michael's College Plan and ERISA. Rather, it paid only the value of such shares on what it deemed the "Good Order" or "Effective Date"—many days earlier, and thousands of dollars less. Plaintiffs added an additional claim for breach of the fiduciary duty of impartiality after TIAA-CREF agreed to pay tens of thousands of non-ERISA accountholders the full value of their shares on the processing date, but declined to do the same for ERISA plan participants.

TIAA-CREF now seeks summary judgment based on a variety of technical arguments under ERISA and SEC rules. Each is incorrect, raises disputed issues of fact, or both. TIAA-CREF argues, wrongly, that Plaintiffs must prove an "impermissible motive"; that it was "simply following the governing prospectuses"; that SEC Rule 22c-1 prohibits the relief Plaintiffs seek; that investment gains earned after the Good Order Date are not "plan assets"; and that it owes no duty of impartiality.

None of these arguments entitles TIAA-CREF to summary judgment. First, motive is not relevant and would raise factual issues if it were. Second, TIAA-CREF violated the St. Michael's College Plan and ERISA by not paying Plaintiffs the value of their shares on the day it sold them. TIAA-CREF's prospectus is not the governing plan document, and, in any event, TIAA-CREF violated it by not transferring Plaintiffs' funds for more than seven calendar days. Third, SEC Rule 22c-1 is not applied to prohibit broker/dealers from giving customers investment gains earned during processing delays, as TIAA-CREF's own securities expert testified. TIAA-CREF's payment of such gains in *Rink* and other individual cases confirms the point. Fourth, TIAA-CREF concedes that Plaintiffs' mutual fund shares (which it calls



"accumulation units") are "plan assets." Under "ordinary notions of property rights," that status cannot change merely because Plaintiffs ask TIAA-CREF to sell the shares. The same applies to gains allocated to the fund shares. Lastly, TIAA-CREF owes a duty with respect to each act it undertakes as a fiduciary, including the settlement of claims. While TIAA-CREF is not obligated to provide the same relief to every investor who brings a claim, it may not treat two customers with identical claims differently with no reasonable basis for doing so. To date, TIAA-CREF has advanced no such reason.

TIAA-CREF's technical arguments are not only wrong, they miss the larger picture. ERISA was not enacted to prune and pare away the common law rights of plan participants. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114 (1989) (rejecting "a reading of ERISA [which] . . . would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted."). Rather, Congress's "principal goal" was "'to *protect* . . . the interests of participants in employee benefit plans and their beneficiaries.'" *Gerosa v. Savasta*, 329 F.3d 317, 328 (2d Cir. 2003) (quoting 29 U.S.C. § 1001(b)) (emphasis added). The statute is to "be construed liberally to provide the maximum degree of protection to working men and women covered by private retirement programs." S. Rep. No. 93-127, 93d Cong., 2d Sess. 18 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4838, 4854. As the Second Circuit has emphasized, "[t]he unauthorized diminution of pension benefits . . . is squarely at odds with the congressional purpose of protecting pension benefits." *Geller v. County Line Auto Sales, Inc.*, 86 F.3d 18, 23 (2d Cir. 1996).

In the final analysis, the question of whether TIAA-CREF breached its fiduciary duty presents a factual issue properly resolved at trial. *See, e.g., Donovan v. Bierwirth*, 680 F.2d 263, 275 (2d Cir. 1982). Because Plaintiffs present more than sufficient evidence to present disputed

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

issues of fact (indeed, more than enough to support a verdict in their favor) on this question, and on their prohibited transaction claim, TIAA-CREF's motion for summary judgment should be denied.

## Summary of Argument

The Background and Part I of the Argument summarize the factual and legal bases for Plaintiffs' claims. Key points include the fact that TIAA-CREF's processing delays violated not only its own prospectus but SEC Rules and industry standards; that TIAA-CREF used the investment gains generated by class members' funds during such delays to pay investor losses for which it otherwise would have been liable; and that Plaintiffs' plan document requires transactions to be valued as of the date they are processed.

By failing to process Plaintiffs' orders promptly, TIAA-CREF violated its duty of care under ERISA § 404(a)(1)(B). By retaining the investment gains earned by Plaintiffs' funds during the delays, it violated its duty of loyalty under section 404 and engaged in prohibited transactions in violation of section 406. Finally, by paying such investment gains to the non-ERISA accountholders in *Rink* (and, earlier, to several individuals) but refusing to pay ERISA claimants with no reasonable basis for the difference in treatment, it violated its fiduciary duty of impartiality.

Part II of the Argument addresses TIAA-CREF's attempts to avoid its fiduciary obligations. Contrary to TIAA-CREF's first point, its motive is not relevant, and neither its prospectus nor SEC Rule 22c-1 excuse its conduct. TIAA-CREF's contention that it is not a fiduciary fails because it had actual control of the distribution of Plaintiffs' plan assets under ERISA and the relevant case law. TIAA-CREF's assertion that fiduciary duties do not apply when settling cases is also incorrect. Fiduciary duties extend to all fiduciary responsibilities,

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 3 -

including the handling and settling of claims.  Finally, TIAA-CREF engaged in "prohibited

transactions" under section 406 of ERISA.  Section 406 prohibits a "party-in-interest" from

"us[ing] assets of the plan."  The record shows that TIAA-CREF did in fact use plan assets to

generate investment gains, and the statutory definition leaves no doubt that it is a "party-in-

interest."  As a factual matter, the record also shows that TIAA-CREF benefited from the

practice, because it did not have to dig into its own pocket to pay other customers for investment

losses resulting from its processing delays.

Factual Background

I.     TIAA-CREF FAILED TO COMPLY WITH INDUSTRY PRACTICE, REGULATORY
       REQUIREMENTS, AND ITS OWN PROSPECTUS IN PROCESSING PLAINTIFFS'
       ORDERS.

     A.     TIAA-CREF Was Required To Transmit Redemption Orders For Execution The
       Day They Were Received; Settle Within Three Days Of Executing The Order;
       And Pay No Later Than Seven Days After The Good Order Date.

TIAA-CREF acknowledges at the outset that "Plaintiffs' transactions were not

processed" "within the seven-day period specified in the applicable prospectus."  Doc. 341 at 1.

It neglects to add that TIAA-CREF's processing delays violated not only its own prospectus but

SEC regulations and industry standards.[1]  In short, TIAA-CREF failed to carry out its customers'

instructions diligently and competently in violation of its fiduciary duty to do so.

TIAA-CREF Individual & Institutional Services, LLC ("TIAA-CREF Services" or

"Services") functioned as the broker-dealer for the TIAA Real Estate and CREF Funds during

the Class Period.[2]  Plaintiff's Statement of Disputed and Additional Facts ("PSOF") 101.  It was

responsible for taking in and transmitting customer orders.  Orders were time-stamped and

scanned by the "back office" of TIAA-CREF's "Operations Unit."  PSOF 103.  They were then

---

[1] Nor does it mention that Plaintiffs were only two of more than 100,000 TIAA-CREF customers
so affected, or that TIAA-CREF's processing problems date back to at least 1998, when it was
specifically warned about the problem in writing by the SEC.

[2] The Class Period runs from August 17, 2003, to May 9, 2013.  *See* Doc. 306 at 19.

gravel &
shea    ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 4 -

forwarded to the "middle office" to make sure they were "in good order." PSOF 104. If so, the order was routed for execution and posting to TIAA-CREF's books and records. PSOF 105.

Regulations and industry standards govern each step of the redemption transaction. Initially, SEC Rule 22c-1 requires the order to be transmitted the same day it is received, so that it may be executed at that day's price. According to the SEC:

> It is the responsibility of the dealer [*i.e.*, TIAA-CREF Services] to establish procedures which would assure that upon his receipt of a customer's order it will be transmitted so that it will be received by the underwriter [*i.e.*, TIAA-CREF] before the time when the price applicable to the customer's order expires, except that where the price is based on the net asset value at the time of the Exchange (e.g. 3:30) it should be transmitted before the close of the underwriter's business day.

PSOF 106.

After the order is transmitted and executed, it must be "settled."[3] TIAA-CREF's expert, Stanley Monsowitz, testified that standard industry practice is to settle a trade within three business days of receipt of the customer's order, referred to as "T+3." *See* PSOF 108. That three-day settlement period is also spelled out in SEC Rule 15c6-1, 17 C.F.R. § 240.15c6-1(a) (prohibiting broker/dealers from providing funds later than the third business day after the order is received).[4] TIAA-CREF has admitted that the industry standard is to pay customers within two to five days. PSOF 109.

---

[3] "Settlement" means the "actual exchange of securities and payment." 6 Louis Loss and Joel Seligman, *Securities Regulation* 2924 (rev. 3d ed. 2002) ("Loss").

[4] The SEC exempts "certain insurance contracts," including variable annuities "issued by an insurance company," from the three-day requirement and instead imposes a seven-day requirement. *See* Securities Transactions Settlement, Securities Act Rel. No. 7177, Exchange Act Release No. 35815, Investment Co. Act Release No. 21117, [1995 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 85,628, at 86,752 (June 6, 1995). CREF's variable annuities do not appear to qualify for the seven-day rule. CREF is not an "insurance company" under section 2(a)(17) of the Investment Co. Act, 15 U.S.C. § 802-02(17), because its "primary and predominant business activity" is not "the writing of insurance." CREF writes no insurance; it is a regulated investment company. *See* Doc. 341 at 19.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

Finally, TIAA-CREF's prospectuses state that, "in general," payments and transfers to other companies will be made "within seven calendar days after we've received the information we need to process a request." *See* PSOF 110. That statement (though not TIAA-CREF's actual practices) reflects the requirements of 15 U.S.C. § 80a-22(e) and SEC Rule 22(e), which state that payment on a redemption order must never exceed seven days, except in extremely rare circumstances not present here.[5]

### B.    TIAA-CREF's Practices Violated Regulatory Requirements And Industry Standards By A Wide Margin.

Although TIAA-CREF touted "same day transaction processing" as a key reason retirement plans should invest with it, PSOF 111, the record is clear that TIAA-CREF violated regulatory requirements, industry practices, and its own prospectuses for tens of thousands of customers, over a period of many years, and by a wide margin.  Although its own counsel emphasized that redemption orders must be processed on the Good Order Date and must settle within three days, *see* PSOF 112, more than 46 percent of TIAA-CREF's payments were delayed by more than seven days between October 2005 and October 2007.  *See* PSOF 113.  As its own lawyers said:

> . . . [TIAA-CREF's] standards are not in line with generally practiced turnaround standards for price dependent transactions within the mutual fund industry.  The majority of mutual funds have established same day turnaround standards for price dependent activity, to mitigate the dilutive effort as of trading as well as limit opportunities for late trading.

PSOF 114.

The record also shows that TIAA-CREF had a history of processing delays.  The SEC raised concerns about them in 1998 following an examination of TIAA-CREF's books and

---

[5] The exceptions involve:  (i) NYSE closings or restrictions on trading; (ii) emergencies which prevent the sale of securities or valuation of funds; or (iii) SEC orders for the protection of stockholders. None apply here.



gravel &
shea  |ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

records. *See* PSOF 115.[6]  Delays "ballooned" following TIAA-CREF's conversion from its "Legacy" computer platform to one known as "Omni," which began in 2005. *See* PSOF 117. Between 2006 and 2008 "there were well in excess of a hundred thousand accounts that had delayed distribution issues." PSOF 118.[7]  An internal TIAA-CREF study showed that, between January 1 and June 15, 2007, the *average* delay was more than 40 days. *See* PSOF 119. An analysis prepared by TIAA-CREF for this case shows that more than $564 million in losses occurred because of delayed processing between 2003 and 2010. PSOF 131.

After being retained to study the problem, Deloitte concluded that "TIAA-CREF's current process management maturity level borders between ineffective and immature." PSOF 120.  More colloquially, TIAA-CREF employees were quoted in press reports as saying the software conversion "turned out to be a fiasco internally" and "[t]he bottom line is this project, and the company, is a mess." PSOF 121.

C.   TIAA-CREF Did Not Pay Plaintiffs And Other Class Members The Investment Gains Generated By Their Funds During Its Processing Delays, Contrary to Plaintiffs' Plan Document.

TIAA-CREF compounded its failure to process customer orders promptly by retaining any investment gains which resulted from the delay.  Between the Good Order and Processing Dates, class members' accounts remained invested in the TIAA-CREF variable annuity funds they had chosen; they could even be viewed on TIAA-CREF's website. PSOF 123.  The price of Plaintiffs' fund shares (and those of all other class members) increased in the interim.  PSOF

---

[6] After pointing to several examples of lengthy delays, *see* PSOF Ex. 34 at TIAA-WALKER-010950, it recommended "that the processing system be reviewed" and instructed TIAA-CREF to "provide this office with your proposals on how 'as of' [*i.e.*, backdated] transactions can be reduced." *Id.* at TIAA-WALKER-010953. The SEC was also concerned about TIAA-CREF's practice of investing incoming funds from favored institutional clients *before* it had the information needed to execute the order, *i.e.*, before the Good Order Date. *See id.*

[7] A February 2006 Management Report noted that approximately 15,000 participants had experienced delays since November 2005 alone. *See* PSOF 122.



gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

125. However, on the Processing Date TIAA-CREF cut a check only for the value of the customer's account on the Good Order Date.  PSOF 125.

TIAA-CREF's practice violated the St. Michael's College Plan.  It provides that "[t]he *processing date* of a transaction will be binding for all purposes of the Plan and *considered the applicable Valuation Date* for an investment transaction."  PSOF 126 (emphasis added); *see also* PSOF Ex. 13 (Mark Johnson Decl. ¶ 13).  As discussed in Part IIB below, TIAA-CREF used the investment gains in class members' accounts to meet its own legal obligations to other customers who had suffered losses as a result of processing delays.  As discussed in Part IIC, as a fiduciary TIAA-CREF was required to make good those losses out of its *own* pocket.

II.   TIAA-CREF USED INVESTMENT GAINS GENERATED BY PLAINTIFFS' FUNDS TO MEET ITS LEGAL OBLIGATIONS TO CUSTOMERS WHO SUFFERED LOSSES AS A RESULT OF PROCESSING DELAYS IT CAUSED.

   A.   TIAA-CREF Services Is Liable For Investor Losses Caused By Its Processing Delays.

Processing delays occurred with respect to both outgoing and incoming funds during the Class Period.  *See* PSOF 127.  Such delays can result in investor losses in two ways.  During a rising market, delayed processing on an incoming order will mean it will cost more to purchase the same number of shares.  *See* PSOF 128.  During a falling market, delayed processing of an outgoing order will mean the customer's shares will not be worth as much on the day they are sold as on the date the order was placed.  *Id.*

Under SEC rules, the party responsible for the processing delay—in this case the broker/dealer TIAA-CREF Services—must dig into its own pocket to pay any losses which result.  TIAA-CREF's expert Stanley Monsowitz testified that in his experience "the regulators insisted you make the customers whole.  If there was a gain, they didn't care, but their caring was that the customers didn't lose."  PSOF 129.  Similarly, TIAA-CREF's Managing Director of

gravel &
shea   ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

Client Services, Peter Case,[8] explained that "the responsible party reimburses the fund for any negative impact caused by their [processing delay]." PSOF 129.

The testimony of Mr. Monsowitz and Mr. Case is confirmed by FINRA's recent enforcement action against Pruco Securities, LLC. *See* Ex. A. Pruco provided brokerage services for Prudential's mutual funds and other investment products. *See id.* at 1-2 & n. 2. In June 2011, Pruco self-reported that its operations unit had not been processing mutual fund orders sent by facsimile and mail on the day they were received. *See id.* Rather, "personnel believed that they could use their 'best efforts' to process a paper order" up to two days after it was received. *Id.* at 2.

Pruco priced orders on the day they were processed, rather than the day they were received. Ex. A at 2. As described above, that practice meant that certain "customers received an inferior price on their orders" and suffered a loss. *Id.* It turned out that about 34,000 customers had in fact suffered such losses. *Id.* at 3. FINRA required "that each customer receive the *best price* for a single order or aggregated orders, as applicable, between the actual trade date price and the price for the two prior market days" [*i.e.*, when the order was received]. *Id.* (emphasis added). Pruco was required to pay, from its own pocket, "at least $10.7 million plus interest." *Id.*[9]

B.    Rather Than Reimbursing Investor Losses Due To Processing Delays From Its Own Pocket, TIAA-CREF Used Investment Gains From Plaintiffs' Accounts To Do So.

The one-to-two day processing delay at Pruco pales in comparison to the seven-day-plus processing delays suffered by class members here—which, for more than a year, *averaged* more

---

[8] TIAA-CREF designated Mr. Case as its Rule 30(b)(6) witness.

[9] Notably, FINRA did not find a violation of Rule 22c-1 with respect to customers in Plaintiffs' position, whose shares increased in value after the Good Order Date. It did not require Pruco to demand that such customers return such investment gains.


gravel &
shea   ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 9 -

than 40 days—as do the $10.7 million in investor losses. An analysis prepared by TIAA-CREF

for this litigation shows that, between 2003 and 2010, more than $564 million in losses occurred

at TIAA-CREF as a result of delayed processing. *See* PSOF 131. Unlike Pruco, however,

TIAA-CREF paid redeeming customers whose share prices had declined the value of their shares

on the Good Order Date. However, it did not dig into its own pocket to do so. Rather, it used

the investment *gains* which had been earned during processing delays on other customers'

accounts, including those of Plaintiffs and the class members they represent.

TIAA-CREF referred to such gains as "Transaction Fund Earnings" or "TFE Gains."

PSOF 133. All such gains were credited to an internal "TFE Gain" account held by TIAA-CREF

Services. PSOF 134. Losses after the Effective Date were charged to a "TFE Loss" account

held by Services. *Id.*

The "TFE Loss" account was charged or "trued up" against the "TFE Gain" account each

quarter. *See* PSOF 135. Any amounts remaining in the TFE Gain Account were used to pay

administrative expenses, including salaries. *See* PSOF 136. TIAA-CREF did not pay Plaintiffs

or other class members any of the investment gains which their accounts earned after the Good

Order Date. *See* PSOF 137.

Argument

I.   THE RECORD EVIDENCE IS SUFFICIENT TO SUPPORT A VERDICT ON EACH
     OF PLAINTIFF'S CLAIMS.

    A.   <u>TIAA-CREF's Conduct Violated Its Fiduciary Duty Of Loyalty And The
     Categorical Bar Against Using Plan Assets Under Section 406 Of ERISA.</u>

        1.   The Fiduciary Duties Of Care And Loyalty Are Well-Established At
          Common Law.

An individual who, like Plaintiffs here, instructed his broker or trustee to sell stock on his

behalf would be surprised if the latter delayed doing so in violation of regulatory requirements,

industry standards, and his own representations. But that individual would be astonished if the



gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

broker or trustee then asserted that his customer was entitled only to the price of the stock on the

day he asked it to be sold.  In that event, the broker or trustee would not only have performed

incompetently, he would have benefitted from his own ineptitude.  Finally, the individual might

be dumbfounded to find that the broker had paid out the investment gains to tens of thousands of

others whose orders were delayed, but refused to pay any such gains to him.

Common law has long prohibited such conduct, and ERISA has codified and

strengthened that prohibition.  The Delaware Supreme Court has summarized the common law

fiduciary duties involved:

> The relationship between a customer and stock broker is that of
> principal and agent.  The broker, as agent, has a duty to carry out
> the customer's instructions promptly and accurately.  In addition,
> the broker must act in the customer's best interests and must
> refrain from self-dealing unless the customer consents, after full
> disclosure.  These obligations at times are described as fiduciary
> duties of good faith, fair dealing, and loyalty.  They are
> comparable to the fiduciary duties of corporate directors, and are
> limited only by the scope of the agency.

*O'Malley v. Boris*, 742 A.2d 845, 849 (Del. 1999); *see also Conway v. Icahn & Co., Inc.*, 16

F.3d 504, 510 (2d Cir. 1994) ("relationship between a stockbroker and its customer is that of

principal and agent and is fiduciary in nature").

The same duties apply under the common law of trusts.  As the leading treatise explains:

> . . . the duty of the trustee to make payments or distributions of
> income or principal to the proper party, at the prescribed time and
> in the required medium, is absolute, and the trustee will not be
> deemed to have satisfied those obligations by making a reasonably
> prudent and careful effort to pay or distribute.  This rule governs
> distributions upon the termination of trusts, as well as those
> occurring during the normal trust term.

Mary F. Radford, George G. Bogert & George T. Bogert, The Law of Trusts and Trustees § 1010

at 481-83 (3d ed. rev. 2010) ("Bogert").

gravel &
shea   ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B), specifically recognizes a fiduciary's duty of care. It requires a fiduciary to discharge his duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

In the instant case, the evidence indicates that TIAA-CREF did breach its duty to process Plaintiffs' orders promptly and accurately. Indeed, it is difficult to reach any other conclusion—particularly since TIAA-CREF promoted itself as providing "same day transaction processing." PSOF 111.[10] As discussed in Part IA above, TIAA-CREF violated SEC rules, industry norms, its prospectus, and own representations.[11]

> 2.    A Broker Who Delays Executing Its Customer's Order Must Turn Over Any Benefit To The Customer.

As discussed in Part IB above, TIAA-CREF compounded its failure to execute class members' orders promptly and competently by refusing to pay them the amount by which their shares had appreciated on the date their orders were finally processed. Rather, it paid only their value on what it deemed the "Good Order Date." It used the investment gains generated between the Good Order and Processing Dates to meet its legal obligations to other customers, who had suffered investment losses by virtue of its delay. But for the use of Plaintiffs' investment gains, it would have had to dig into its own pocket to compensate such customers.

The fiduciary duty of loyalty prohibits such conduct. It requires an agent to deliver any

---

[10] "If an agent claims to possess special skills or knowledge, the agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents with such skills or knowledge." *See* Restatement (Third) of Agency ("Agency Restatement") § 8.08 (2006).

[11] In determining whether the duty has been breached, a court considers regulatory requirements, industry norms, and the agent's own representations. *See Fustock v. Conticommodity Servs., Inc.*, 618 F. Supp. 1082, 1086 (S.D.N.Y. 1985) (plaintiff's allegations that broker violated industry norms in purchasing silver contracts without adequate margin stated cause of action for breach of fiduciary duty of care). A broker who fails to execute an order promptly breaches the duty of care. *See* Agency Restatement, § 8.09 cmt. 6, illus. 2.


gravel &
shea    ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

benefit resulting from its own breach to the principal. As the Restatement says: "If through the breach the agent has realized a material benefit, the agent has a duty to account to the principal for the benefit, its value, or its proceeds. The agent is subject to liability to deliver the benefit, its proceeds, or its value to the principal." Agency Restatement § 8.01 cmt. d (2006); *see also* § 8.02 cmt. e.[12] The duty of loyalty also forbids an agent from using the client's property for the agent's own purposes. *Id.,* § 8.05(1) cmt. b. Again, the law of trusts is to the same effect. A trustee who delays making distributions is liable for loss during the period of delay as well as income which accrues. Bogert, § 1010.[13]

        3.     ERISA Carries Forward And Strengthens The Fiduciary Obligations Imposed By Common Law.

"ERISA's legislative history confirms that the Act's fiduciary responsibility provisions, 29 U.S.C. §§ 1101-1114, 'codif[y] and mak[e] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts.'" *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) (brackets in original) (quoting legislative history). As the Supreme Court explained, "[R]ather than explicitly enumerating *all* of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility." *Central States, SE & SW Areas Pension Fund v.*

---

[12] Moreover, where a fiduciary wrongfully retains property whose value fluctuates, such as securities, compensation is measured by the highest intermediate price rather than the price at the time the property is turned over. *See Iglesias v. U.S.*, 848 F.2d 362, 364-65 (2d Cir. 1988); *Agamede Ltd. v. Life Energy and Technological Holdings, Inc.*, 2007 U.S. Dist. LEXIS 4698 *10-*14 (S.D.N.Y. 2007); *Pruco, supra,* 9 Loss at 4421 n. 504. Accordingly, Plaintiffs do not concede that TIAA-CREF's liability is limited to the value of their accounts on the Processing Date.

[13] The point is illustrated by *Goodrich v. E.F. Hutton Group, Inc.*, 542 A.2d 1200 (Del. Ch. 1988). Plaintiff there alleged that E.F. Hutton customarily remitted customer funds by means of checks drawn on and mailed from banks more than 500 miles away from whichever brokerage office the customer normally used. *See id.* at 1201. It then kept for itself the float or interest which accrued during the extra day or more the check took to reach the customer. *See id.* Noting the fiduciary relationship between customer and broker, the Delaware court denied E.F. Hutton's motion to dismiss the plaintiff's claim for breach of fiduciary duty. *See id.* at 1204-05.



gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

*Central Transport, Inc.*, 472 U.S. 559, 570 (1985). Accordingly, courts "are to apply common-law trust standards 'bearing in mind the special nature and purpose of employee benefit plans.'" *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996) (quoting legislative history).

"Courts have also recognized that in enacting ERISA Congress made more exacting the requirements of the common law of trusts relating to employee benefit trust funds." *Donovan v. Mazzola*, 716 F.2d 1226, 1231 (9th Cir. 1983). The Supreme Court has noted that "ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection." *Varity*, 516 U.S. at 497. As the Second Circuit has emphasized, the statute is designed "'to remove jurisdictional and procedural obstacles which in the past appear to have hampered effective enforcement of fiduciary responsibilities under state law for recovery of benefits due to participants.'" *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 145 (2d Cir. 1999) (quoting legislative history). Accordingly, "a reading of ERISA [which] . . . would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted" must be rejected. *Firestone*, 489 U.S. at 114. Rather, "at the slightest suggestion that any action taken was with other than the beneficiaries in mind, a trustee is subject to liability for resulting injury that the beneficiaries may suffer." *Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir. 1984).[14]

      4.     Federal Courts Have Found That Delayed Processing And The Use Of Plan Assets By A Fiduciary Violate Sections 404 And 406 Of ERISA.

It follows from Congress's codification and strengthening of fiduciary standards that Plaintiffs' claims, cognizant under common-law, are equally viable under ERISA. The case law

---

[14] As discussed in Part IIC below, Congress particularly tightened standards with respect to "parties in interest." In section 406 of ERISA, 29 U.S.C. 1106, Congress created "a categorical bar to certain types of transactions that were regarded as likely to injure a plan." *Reich v. Compton*, 57 F.3d 270, 275 (3d Cir. 1995). Among other things, section 406 of ERISA flatly prohibits the "use by . . . a party in interest of any assets of the plan." Sec. 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).


gravel &
shea   ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

confirms that point.  The Second Circuit has ruled both that processing delays themselves and the retention of investment gains earned during such delays violate a fiduciary's duty of care and loyalty.  In *Blatt v. Marshall and Lassman*, 812 F.2d 810 (2d Cir. 1987), an accountant requested a lump sum distribution of his retirement account on leaving his firm, but the principals of the firm refused to execute a required form.  *See id.* at 811.  *Blatt* held that the principals were fiduciaries under ERISA, because they had exercised actual control over the disposition of the retirement funds.  *See id.*  It also ruled that they had breached their fiduciary obligation "to discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" by delaying "the receipt of benefits to which the participant is entitled."  *Id.* at 813 (quotations and citations omitted).[15]

In *John Blair Commc'ns Profit Sharing Plan v. Telemundo Group*, 26 F.3d 360 (2d Cir. 1994), the Court held that a fiduciary that delays distributing plan assets, and does not distribute investment gains earned during the delay period, also violates its duty of loyalty.  In *John Blair*, one company acquired another and split the acquired company's retirement plan into two parts, called the "New Blair Plan" and the "Telemundo Plan."  26 F.3d at 362.  Telemundo acted as interim trustee for the original retirement plan (called the "Old Blair Plan").  It was required to transfer the accounts of those employees covered by the New Blair Plan (comprising about 89% of the total assets in the Old Blair Plan) promptly after the June 30, 1988 valuation date for the Old Blair Plan.  *Id.* at 363.  It did not do so.  Rather, it transferred the assets to New Blair in installments in October, November, and December 1988.  In the interim, the assets had

---

[15] Similarly, in *Dobson v. Hartford Fin. Servs. Group*, 389 F.3d 386 (2d Cir. 2004), the Second Circuit reversed summary judgment for an insurer which had delayed payment on plaintiff's disability claim for more than a year.  It remanded for reconsideration of the District Court's denial of class certification on plaintiff's disgorgement claim and his claim for interest on the delayed benefit payment.  *See id.* at 40-41.  The insurer had already stipulated to a judgment in the District Court that it disgorge the profits earned on the amount during the delay.  *See id.* at 390.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION
- 15 -

appreciated in value by about $500,000. *See id.* at 364. However, "[n]one of the transfers [to the New Blair Plan] included interest or appreciation of the assets between the valuation date and the actual transfer dates." *Id.* Rather, such gains were kept in the Telemundo Plan.

The Second Circuit held that Telemundo's failure to transfer the investment gains "constituted a violation of its fiduciary duties under § 404 of ERISA, 29 U.S.C. § 1104." *John Blair*, 26 F.3d at 367.[16] As a dual fiduciary for both the New Blair and Telemundo Plans, the Court said, "it owed obligations of loyalty to the members of both plans." *Id.* According to the Court, "Telemundo's duty of loyalty to its own plan members did not extend to giving them a windfall at the expense of the New Blair Plan participants. Its conduct was inconsistent with the strict duty owed to the New Blair participants." *Id.*

In a third case involving closely-related issues, the federal district court in *Tussey v. ABB, Inc.*, 2012 WL 1113291 (W.D. Mo. March 31, 2012) *appeal docketed*, No. 12-2060/12-3794 (8th Cir. May 3, 2012), ruled that two units of Fidelity Investments had breached their fiduciary duty by keeping float income earned on participant contributions and distributions. *See id.* at *2. Fidelity deposited incoming contributions in its own bank accounts before investing them, and it kept redeemed amounts in its own bank accounts until participants cashed their redemption checks. *See id.* at *32-*34. Rather than paying the interest generated by such accounts to the plan, however, Fidelity retained it. *See id.* at 33-34. *Tussey* held that, since this float income was not used "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries, nor to defray administration costs for the Plan's benefit, Fidelity Research and Fidelity Trust breached their fiduciary duties of loyalty to the Plan." *Id.* at *35.

---

[16] The Court also ruled that Telemundo had violated § 208 of ERISA, 29 U.S.C. § 1058, which regulates the spinoff of benefit plans. *See id.* at 364-67.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

B.     TIAA-CREF's Payment In Full Of Investment Gains To Non-ERISA
       Accountholders While Refusing To Pay ERISA Accountholders The Same
       Amount Violates Its Duty Of Impartiality.

A fiduciary also has a duty to treat beneficiaries—including ERISA plan participants—

impartially. *See Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir. 1984) ("a trustee has a duty to

deal impartially with beneficiaries"). This duty applies across plans, *John Blair Com'ns Profit

Sharing Plan v. Telemundo Group*, 26 F.3d 360, 367-68 (2d Cir. 1994), and it "is applicable to

all duties of the trustee." Restatement (Third) of Trusts ("Trusts Restatement") § 79(1)(a) cmt. a

(2005).

Nor do a trustee's fiduciary duties cease once a lawsuit is filed. Rather, "[a] trustee's

obligation with respect to litigation is an application of the trustee's general obligation to act

with prudence, loyalty, and impartiality in the interests of the beneficiaries." *White v. Public

Emps. Ret. Bd.*, 268 P.3d 600, 611 (Or. 2011). Such obligations also extend to the settlement of

litigation. *See Harris v. Koenig*, 602 F. Supp. 2d 39, 54-56 (D.D.C. 2009) (denying motion to

dismiss breach of fiduciary duty claim under ERISA against State Street Bank for failing to

investigate and preserve potential ERISA claims before allowing such claims to be extinguished

in securities class action settlement).

Although a fiduciary need not treat beneficiaries identically, Trusts Restatement § 79

cmt. 6, it must have a justifiable basis for treating similarly-situated individuals differently. *Cf.

Frary v. Shorr Paper Products, Inc.*, 494 F. Supp 565, 569 (N.D. Ill. 1980) (summary judgment

granted for plaintiff where employer and plan trustee failed to offer "*any* justification for their

policy" of selectively denying lump sum payment to employees who went to work for

competitors) (emphasis in original) with *Morse*, 732 F.2d at 1146-47 (no liability where trustees

"*have* come forward and fully justified their decision to deny accelerated distribution" to

plaintiff) (emphasis added).


gravel &
   shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 17 -

The Second Circuit in *John Blair* held that a dual fiduciary had violated its duty of

impartiality under ERISA by allocating investment gains on a pooled account to one plan at the

expense of another. *See id.*, 26 F.3d at 367-68.[17]  In *Jackson v. Truck Drivers' Union Local 42*

*Health and Welfare Fund*, 933 F. Supp. 1124 (D. Mass. 1996), the court found a breach of the

same duty in a case where trustees of an underfunded ERISA plan had terminated it and

transferred its assets to a solvent plan. *See id.* at 1144-45.  In exchange, the solvent plan agreed

to provide prospective benefits to beneficiaries without pending claims, but not to those with

currently pending claims. *See id.* at 1144.  In effect, to "save the plan the Trustees cut a deal"

with the solvent plan to provide prospective benefits "but deny benefits to those persons with

claims already in the pipeline." *Id.*

The only obligation of the solvent plan with respect to the latter group was "to use [its]

best efforts to settle their claims." *Id.*  Although the solvent plan offered 25 cents on the dollar to

settle such claims, it was not "legally responsible for doing so," nor was it required to spend all

remaining assets of the underfunded plan to do so. *Id.* at 1144-45.  Based on the duty of

impartiality, *Jackson* concluded that the trustees were prohibited from disfavoring sick

beneficiaries to resolve the funding shortfall, suggesting that a more equitable *pro rata*

distribution of assets was required. *Id.* at 1144-45.

In the instant case, TIAA-CREF has advanced no reasonable or principled basis for

treating ERISA participants differently from their non-ERISA counterparts.  On the contrary,

TIAA-CREF's Executive Vice President Ed Van Dolsen has testified that TIAA-CREF is

obliged to treat accountholders the same if they are similarly-situated, and that the same

fiduciary principles apply to both ERISA and non-ERISA customers.  PSOF 140.  Specifically,

---

[17] *John Blair* is discussed earlier, at pages 15-16.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 18 -

he has agreed that "if two people suffer losses because of a delay in a transaction, all other things being equal, those two people should be compensated or treated in the same fashion." *Id.* [Van Dolsen 35]. He has also agreed that the claimants in this case and *Rink* "should be treated the same," and that there is no policy at TIAA-CREF which would prevent such treatment. *Id.* [43, 48]. In view of the law and Mr. Van Dolsen's testimony, summary judgment for TIAA-CREF is not appropriate on Plaintiffs' duty of impartiality claim.

II.     TIAA-CREF'S ARGUMENTS IN SUPPORT OF SUMMARY JUDGMENT ARE INCORRECT AS A MATTER OF LAW.

A.     TIAA-CREF's Motive Is Not Relevant To Plaintiffs' ERISA Claims, Nor Do Its Prospectus Or SEC Rule 22c-1 Provide Defenses.

Notwithstanding judicial admonitions that ERISA be construed liberally and that jurisdictional and procedural obstacles be removed, TIAA-CREF asserts that it is entitled to summary judgment based on: (i) requirements (such as "improper motive") which were not imposed by common law and do not appear in ERISA; (ii) documents (its prospectuses) which are not part of an employee benefits plan; and (iii) agency rules adopted under entirely different statutes. Each of these arguments is wrong on its merits, and each conflicts with ERISA's policy "to provide the maximum degree of protection to working men and women covered by private requirement programs." S. Rep. No. 93-127, 93d Cong., 2d Sess. 18 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4838, 4854.

1.     Improper Motive Is Not An Element Of Plaintiffs' Proof.

TIAA-CREF immediately gets off on the wrong foot by arguing that Plaintiffs must show it had an "improper motive" in failing to pay them the investment gains their funds earned during its processing delays. *See* Doc. 341 at 1-2, 11-17. As set forth in the margin, court after court has ruled that bad faith is not an element of a breach of ERISA fiduciary duty claim, nor good



gravel &
shea   ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 19 -

faith a defense.[18]

The rule is the same in the Second Circuit.  It has stressed that the protection of beneficiaries requires that the duty of loyalty "be broadly construed" and that "liability be imposed even when there is no 'taint of scandal, no hint of self-dealing, no trace of bad faith.'" *Lowen v. Tower Asset Management*, 829 F.2d 1209, 1213 (2d Cir. 1987) (citing *Leigh*, 727 F.2d at 124, and quoting *Cutaiar v. Marshall*, 590 F.2d 523, 528 (3d Cir. 1979)).  It is also consistent with common law.  There, "'[w]hether the trustee acted in good faith and with honest intentions is not relevant,'" and it is "'not material'" whether the trustee profited from the disloyal act. Trusts Restatement § 78 cmt. b (quoting George T. Bogert, *Trusts* § 95 (Hornbook, 6th ed. 1987)).

The cases cited by TIAA-CREF are not to the contrary.  It relies first on *Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982).  The Court there "accepted that [the trustees] were honestly convinced that acquisition of Grumman by the debt-ridden LTV would mean a less bright future for Grumman" and "posed some special dangers to the participants of the Plan." *Id.* at 276.  The Second Circuit nonetheless affirmed the lower court's conclusion that the plaintiff had shown a likelihood of success on his claim for breach of fiduciary duty by plan trustees.  In other words, *Donovan* makes clear that good faith will not excuse a defendant from an ERISA

---

[18] *See, e.g., Leigh v. Engle*, 727 F.2d 113, 124 (7th Cir. 1984) (declining to consider lower court's findings relating to credibility and good faith because they "simply do not come into play.  Good faith is not a defense to an ERISA fiduciary's breach of the duty of loyalty"); *Byrne v. Calastro*, 205 Fed. Appx. 10, 15 (3rd Cir. 2006) ("ERISA does not require a showing of bad faith"); *McConnell v. Costigan*, No. 00 CIV 4598, 2000 WL 17162723, at *6 (S.D.N.Y. Nov. 14, 2000) ("proof of a defendant's good faith is no defense to a fiduciary's breach of duty under ERISA"); *Gray v. Briggs*, 45 F. Supp. 2d 316, 330 (S.D.N.Y. 1999) (breach of fiduciary duty claims under ERISA "do not require proof of willfulness, and good faith is not a defense"); *United States v. Mason Tenders Dist. Council of Greater N.Y.*, 909 F. Supp. 882, 888 (S.D.N.Y. 1995) ("Good faith alone is not recognized as a defense to a breach of fiduciary duties"); James F. Jordan, *et al.*, Handbook on ERISA Litigation (3rd ed. 2013) § 4.03[A][2] ("Good faith is not a defense to a breach of a fiduciary's duty of loyalty").

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 20 -

breach of fiduciary duty claim.

TIAA-CREF also cites decisions from other jurisdictions, but these too do nothing to help its cause.  None hold that improper motive or bad faith is required.  As explained in the margin, they suggest only the tautological point that proof that a trustee acted in the interest of someone other than beneficiaries supports the conclusion that the trustee did not act solely in the beneficiaries' interest.[19]

> 2. TIAA-CREF May Not Rely On Its Prospectus To Avoid Plaintiffs' Breach Of Fiduciary Duty Or Prohibited Transaction Claims.

TIAA-CREF next asserts that it could not have acted from an improper motive or breached its fiduciary duty because it was "simply following the governing prospectuses."  Doc. 341 at 13.  In the first place, TIAA-CREF *violated* its own prospectuses by failing to make payment "within seven calendar days" of the Good Order Date.  PSOF 138.  TIAA-CREF contends its prospectus is a contract, *see* Doc. 341 at 20-21,[20] but it is black letter law that a party may not insist on one provision of a contract while breaching another.  *See* Restatement (Second) of Contracts § 237 (1981).  By TIAA-CREF's logic, it would be free to keep Plaintiffs' funds invested for its own benefit as long as it wished after Plaintiffs asked for redemptions or transfers, at least as long as it paid interest.  Plaintiffs may not be compelled to make "forced

---

[19] *See Duer Constr. Co. v. Tri-City Bldg. Trades Health Fund*, 132 Fed. App'x 39, 44-45 (6th Cir. 2005) ("the district court's fact-finding that the trustees acted in the interests of the Laborers and Bricklayers unions," who were not beneficiaries, "supports its legal conclusion" that the fiduciary failed to act "solely in the interest of" beneficiaries); *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1401-02 (9th Cir. 1995) (summary judgment improper where there were questions of fact as to whether Revlon acted to maximize funds that would revert to it rather than solely in the interest of beneficiaries); *Wright v. Nimmons*, 641 F. Supp. 1391, 1402-3 (S.D. Tex. 1986) (finding that fiduciary "blatantly disregarded his duty of loyalty by consistently treating the trust assets as if they were his own property" and that plans had "not been administered for the exclusive purpose of providing benefits to participants and beneficiaries").

[20] A prospectus is not in fact a contract, unless it is specifically incorporated in a contract.  *See Bryan Publ'g Co. v. Kuser*, No. 7-07-17, 2008 Ohio App. LEXIS 2198, **13-15 (Ct. App. Ohio 2008); *Wayland Inv., Fund, LLC v. Millenium Seacarriers, Inc.*, 111 F. Supp. 2d 450 (S.D.N.Y. 2000); *Doppett v. Perini Corp.*, 2002 U.S. Dist. LEXIS 4128, *13-*15 (S.D.N.Y. 2002), *aff'd without published opinion*, 53 Fed. Appx. 174 (2d Cir. 2002).



gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

loans," however. *Cf. Dobson*, 389 F.3d at 394 (rejecting plan administrator's position it was "free at will . . . to delay unreasonably, even ad infinitum or until the beneficiary's death" before making a disability benefits determination).   TIAA-CREF's position flies squarely in the face of its fiduciary obligation to distribute funds promptly; not to use them for any purpose other than the participant's benefit; and to turn over the benefit of any delay to the participant.

Moreover, as discussed in Part IC of the Background section above, TIAA-CREF's prospectus conflicts with Plaintiffs' ERISA plan document as to the proper valuation date.   The plan document provides that the participants' accounts are to be valued on the date the transaction is *processed*, not the date the request is received.  PSOF 126.  As the Supreme Court recently made clear, it is the plan document which controls.  *See CIGNA Corp. v. Amara*, 131 S.Ct. 1866 (2011).[21]  TIAA-CREF prospectuses are not plan documents.  PSOF 159-160, and Ex. 13 (Mark Johnson Decl. ¶¶ 16-17).  Notably, TIAA-CREF cites no authority for its position that a prospectus not expressly incorporated in a plan document governs any aspect of an ERISA claim.

Finally, even if its prospectus were part of the plan document, TIAA-CREF would not be excused from complying with its fiduciary duties under ERISA.  *See, e.g., Central States SE & SW Areas Pension Fund v. Central Transp. Inc.*, 472 U.S. 559, 568 (1985) ("[w]e agree with the Court of Appeals that trust documents cannot excuse trustees from their duties under ERISA"); *Best v. Cyrus*, 310 F.3d 932, 935-36 (6th Cir. 2002) ("Because Cyrus could not be 'excused' from his fiduciary duties under ERISA, the language of the plan document could not absolve him of the duty to secure the contributions and repayments.").

---

[21] *Amara* explains that a plan's sponsor "like a trust's settlor, creates the basic terms and conditions of the plan, executes the written instrument containing those terms and conditions, and provides in that instrument 'a procedure' for making amendments." *Id.* at 1877.  In short, the power to set plan terms "is reserved for plan sponsors." *Durham v. Prudential Ins. of Am.*, 890 F. Supp. 2d 390, 396 (S.D.N.Y. 2012) (citing *Amara*, 131 S. Ct. 1866 at 1877).


gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

The point is illustrated by *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461 (S.D.N.Y. 2005). The plan trustees there argued that they did not violate their fiduciary duties under ERISA by purchasing Polaroid stock for the employee retirement plan, even though it was a poor investment, because plan documents required such purchases. *See id.* at 473-74. The court rejected the argument. It explained: "By force of statute, defendants had the fiduciary responsibility to disregard the Plan and eliminate Plan investments in Polaroid stock if the circumstances warranted." *Id.* at 474. Similarly, the Eighth Circuit in *Winer v. Edison Bros. Stores Pension Plan*, 593 F.2d 307 (3d Cir. 1979), rejected the trustees' argument that plan documents prohibited them from paying vested retirement benefits to two employees accused of taking kickbacks. Notwithstanding the plan documents, the *Winer* court ruled that "the Retirement Committee violated their fiduciary duties under ERISA when they refused to pay the pension benefits." *Id.* at 314.

> 3.    SEC Rule 22c-1 Is Not Applied To Prohibit Brokers Who Fail To Process Sell Orders Promptly From Giving Their Clients The Benefit Of Share Price Increases During The Period Of Delay.

TIAA-CREF next argues that "SEC Rule 22c-1 *precludes* CREF from redeeming shares of its securities at *any* price other than the Effective Date value." Doc. 341 at 15 (emphasis in original). Thus, it says, it simply could not "pay[ ] redeeming customers more than the Effective Date value by crediting them with TFE gains and effectively pricing their Units on the Processing Date." Doc. 341 at 15. According to this reasoning, Rule 22c-1 provides a cover for brokers wishing to hold on to a client's securities in order to speculate in an up market—a strange result for a rule designed to *protect* investors.[22]

---

[22] Known as the "forward pricing rule," Rule 22c-1 is meant to put a stop to the practice by some mutual funds of giving favored customers the opportunity to take advantage of a mutual fund's 4 p.m. share price when the price moves after that time—a practice which might be described as "backward pricing." *See United States v. NASD, Inc.*, 422 U.S. 694, 710 N. 19 (1975); *see also* David Wray,

gravel &
shea    ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

The first point TIAA-CREF overlooks is that Rule 22c-1 also contains a timing component, as discussed in Part IA above. It requires orders received before 4 p.m. to be transmitted the same day so they *can* be executed at that day's price. *See* PSOF __. The rule has never been interpreted or applied to prohibit a broker/dealer (like TIAA-CREF Services) which fails to transmit an order in timely fashion from disgorging its investment profits, or otherwise compensating its customers for the use of their funds, as TIAA-CREF's own expert on mutual fund operations testified. Mr. Monsowitz stated: "the broker/dealer can do anything he wants that's advantageous to the customer is my understanding of the regulations." PSOF 130.

Mr. Monsowitz's testimony is borne out by *Pruco* and TIAA-CREF's own payment of the Processing Date price to the settlement class in *Rink*, as well as to several individuals who complained to regulatory agencies. As noted in Part IB, in *Pruco* FINRA required that each customer who suffered a delay "receive the *best price* for a single order or aggregated orders, as applicable, between the actual trade date and the price for the two prior market days [*i.e.*, when the order was received]" (emphasis added). Ex. A at 3. In *Rink*, TIAA-CREF agreed to pay more than 21,000 non-ERISA accountholders the full amount of their investment gains between the Good Order and Processing Dates. PSOF 141. Prior to *Rink*, it had also agreed to pay such gains to several individuals who complained to the NASD, FINRA, and New York City Better Business Bureau. PSOF 142. In other cases, it paid customers who had suffered delays the amount they would have earned if the transfer to another mutual fund had been timely. PSOF 142. In each case, TIAA-CREF paid the customer more than the Good Order Date Price. Yet TIAA-CREF does not suggest any regulatory agency ever admonished it.[23]

---

*Protecting Mutual Funds From Marketing-Timing Profiteers: Forward Pricing International Fund Shares,* 56 Hastings L.J. 585 (Feb. 2005).

[23] TIAA-CREF cites *In re UBS Global Asset Mgmt. (Americas) Inc.*, Investment Co. Act Release No. 29,920, Fed. Sec. L. Rep. (CCH) ¶ 89,702 (Jan. 17, 2012), in support of its argument that Rule 22c-1


gravel &
shea    ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

B.     Contrary To TIAA-CREF's Position, It Is An ERISA Fiduciary Because It Had
       Actual Control Over The Distribution Of Plaintiffs' Funds.

TIAA-CREF argues next that it could not have violated its fiduciary duties because it was

not a fiduciary in the first place. *See* Doc. 341 at 17. TIAA-CREF's argument founders

immediately on *Blatt v. Marshall & Lassman*, 812 F.2d 810 (2d Cir. 1987). As discussed in Part

ID above, *Blatt* involved an accountant who had requested a distribution of his retirement

account from MONY, where it was held. *See id.* at 811. MONY informed him that his former

employer would need to complete a "Notice of Change" form, but this his employer failed to do

despite repeated requests. *Id.* at 811-12. Eventually, he sued the two principals of the firm,

Marshall and Lassman, for breach of fiduciary duty under ERISA. *Id.* at 812. The District Court

dismissed the claim, concluding that Marshall and Lassman "could not be considered

fiduciaries" because they had had no discretionary authority relating to the plan. *Id.*

The Second Circuit reversed. It pointed out that, under section 3(21)(A) of ERISA, 29

U.S.C. § 1002(21)(A), " a person is a fiduciary . . . to the extent he . . . exercises any authority or

control respecting . . . disposition of its assets." *Blatt*, 812 F.2d at 812, 813. It also emphasized

that "Congress intended the term [fiduciary] to be broadly construed." *Id.* at 812. *Blatt*

"conclud[ed] Marshall and Lassman acted as fiduciaries . . . because they exercised *actual*

control over the disposition of plan assets." *Id.* at 813 (emphasis in original). As the Court

explained, "[t]he return of contributions to plan participants is one method of disposition of plan

assets." *Id.* at 813 (citation omitted). Accordingly, when Marshall and Lassman delayed Mr.

Blatt's paperwork, "they effectively prevented the Retirement Committee from returning Blatt's

---

precludes it from paying Plaintiffs their investment gains. The case is completely inapposite. The
violation there involved an investment advisor which substantially overvalued mortgage-backed securities
held by its mutual funds, in violation of its own stated valuation procedure. As a result, the Net Asset
Value and share price of the funds were also overstated. *UBS* has nothing at all to do with processing
delays or the remedies available for them. It is telling that it is the only authority TIAA-CREF cites for
its position.

gravel &
shea   ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

vested contributions to him," and "within the plain meaning of the statute . . . exercised actual control respecting disposition of plan assets." *Id.* Here, TIAA-CREF exercised "actual control respecting disposition of plan assets" and was a fiduciary "to the extent of this actual control" when it delayed transferring Plaintiffs' plan assets and retained investment gains earned during the delay. *Id.*[24]; *see also* PSOF 151-152. TIAA-CREF even exercised control over the (improper) valuation of Plaintiffs' fund units, cementing its status as a fiduciary with respect to the very assets at issue here. *See* PSOF Ex. 13 (Mark Johnson Decl. ¶¶9-12).

TIAA-CREF nevertheless maintains that it cannot be a fiduciary, based on the false assertion that TFE Gains are not "plan assets." *See* Doc. 341 at 24. This assertion depends on a nonexistent distinction between TFE Gains and the fund shares, or "accumulation units" in Plaintiffs' retirement accounts. As a threshold matter, TIAA-CREF concedes that the fund shares are plan assets. *See id.* at 19. When TIAA-CREF receives a redemption request, it does not remove the fund shares from the redeeming beneficiary's account until the date it processes their order. PSOF 123. Nevertheless, where the value of those fund shares increases before TIAA-CREF gets around to redeeming them, TIAA-CREF keeps a portion of the value of those fund shares.

Put simply, the fund shares that Plaintiffs sought to redeem were plan assets when Plaintiffs sought to redeem them, and remained plan assets, even when they increased in value, until they were actually redeemed. The mere fact that Plaintiffs asked for them back did not change their status. Indeed, as in *Blatt,* the fact that TIAA-CREF controls the timing of the

---

[24] *Accord, Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999) (bank that removed stock from a plan's account and replaced it with cash "was an ERISA fiduciary" because it "controlled plan assets," despite having been replaced as a trustee before swapping the stock and charged only with the ministerial task of transferring the plan's assets to the new trustee); *Srein v. Frankford Trust Co.*, 323 F.3d 214, 221-22 (3d Cir. 2003) (trustee with "no discretion" with respect to investment decisions in a life insurance policy "exercised undirected authority and control" over the proceeds of that policy when it received the proceeds and erroneously distributed them to another customer) (quotation omitted).

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION
- 26 -

distribution is what makes it a fiduciary.[25]

The point is made unequivocally by *Commonwealth Edison Co. v. Vega*, 174 F.3d 870 (7th Cir. 1999). The plaintiff company there sought to enjoin the State of Illinois from requiring its ERISA plan to turn over unclaimed plan benefits to state custody. *See id.* at 871-73.[26] The company asserted that the unclaimed benefits were "plan assets" which the plan rather than state was required to administer under ERISA. *Id.* at 873. The Seventh Circuit agreed. As it said, "until the check to the beneficiary is actually presented to the plan for payment through the banking system, and paid, the money due to the beneficiary is an asset of the plan." *Id.* at 873.[27]

Where plan assets appreciate in value during a delay between when they are valued and when they are actually transferred, the resulting investment experience must be transferred with the plan assets and may not be pocketed by an ERISA fiduciary. *See John Blair Com'ns Profit Sharing Plan v. Telemundo Group*, 26 F.3d 360, 364-366, 367-68 (2d Cir. 1994). Accordingly, the Court should reject TIAA-CREF's suggestion that, under "ordinary notions of property rights," any increase in fund share value after the Good Order Date is somehow severed from the fund share itself. *Cf.* Doc. 341 at 20 ("Plaintiffs and their plans had no right to any increase in

---

[25] TIAA-CREF spends much time arguing that Plaintiffs have no ownership interest in the underlying securities owned by the CREF Funds or TIAA-Real Estate Fund. *See* Doc. 341 at 19. That argument also misses the point. If Plaintiffs owned Exxon or General Electric, they would not suggest that they owned any oil fields or toaster ovens. They would assert that, if their broker delayed executing a sell order promptly and the shares increased in value during the delay, the broker could not keep the gain for himself.

[26] Under the state's Uniform Disposition of Unclaimed Property Act, anyone holding money not claimed by its owner for five years must turn it over to the state for safekeeping, thereby effectively giving the state an interest-free loan. *Id.* at 872.

[27] TIAA-CREF relies on *In re Halpin*, 566 F.3d 286 (2d Cir. 2009), *see* Doc. 341 at 21-23, but it is not to the contrary. *Halpin* did not consider the redemption of plan assets for less than their value on the processing date. Indeed, it did not address the redemption of plan assets at all. *Id.* at 288-92. Rather, the question there was whether employer contributions which should have been but were not ever made to a plan, and which the plan itself did not define as plan assets, were nevertheless plan assets. *Id.* at 290-91. *Halpin* concluded they were not. Here, in contrast, the contributions were made, and TIAA-CREF acknowledges that the fund shares which those contributions purchased, and which TIAA-CREF held, were plan assets. Accordingly, *Halpin* is not on point.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 27 -

the value of the Accounts beyond that [Good Order] Date and therefore no property interest in TFE Gains"). If a trustee is holding an item of property (for example, an antique or a parcel of land) on behalf of the beneficiary, the entire item belongs to the beneficiary regardless of any fluctuation in value.

This conclusion would be true even if TIAA-CREF moved the plan assets out of beneficiaries' accounts upon receipt of redemption requests. *See Tussey v. ABB, Inc.*, 2012 WL 1113291 *32-35 (W.D. Mo. March 31, 2012) (finding that two units of Fidelity Investments breached their fiduciary duties by retaining float income generated by incoming and outgoing contributions kept temporarily by Fidelity in its own bank accounts). TIAA-CREF attempts to equate its prospectus to a contract requiring a different result, but: (1) the prospectus cannot trump the plan document or ERISA itself; and (2) having violated the prospectus requirement that it pay within seven days, TIAA-CREF cannot avail itself of the Good Order Date price provision.

C.   TIAA-CREF Is Not Entitled To Summary Judgment With Respect To Plaintiffs' Prohibited Transaction Claim.

   1.   TIAA-CREF And Each Of Its Defendant Entities Are Subject To Liability As A "Party In Interest" Under ERISA § 406 For Using Plaintiffs' Funds.

Lastly, TIAA-CREF attacks Plaintiffs' "prohibited transaction" claim "for reasons similar to those" it asserted relating to Plaintiffs' duty of loyalty claim. Doc. 341 at 29. The attack also fails for similar reasons.

As discussed in Part IA above, Congress not only codified but strengthened common law fiduciary duty standards under ERISA. In particular, under ERISA section 406, 29 U.S.C. § 1106, Congress created "a categorical bar to certain types of transactions that were regarded as likely to injure a plan." *Rink v. Compton*, 57 F.3d 270, 275 (3d Cir. 1995). Included in the ban is the "use by . . . a party in interest of any assets of the plan." Sec. 406(a)(1)(D), 29 U.S.C.



gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 28 -

§ 1106(a)(1)(D). The Second Circuit has said that section 406 must "be broadly construed." *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987). In *Harris Trust v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000), the Supreme Court held that a party-in-interest could be sued directly under section 406 for engaging in a prohibited transaction.

Plaintiffs allege that TIAA-CREF, "and each of the Defendant entities of which it is comprised," violated section 406(a)(1)(D) by using the funds in their accounts after plan participants requested a transfer or distribution. *See* Doc. 205 at 12-13. As discussed in Part IIB of the Background section, the record shows that TIAA-CREF credited investment gains earned after Good Order Date to its own "TFE Gain" account. It used such gains to pay investor losses for which TIAA-CREF Services otherwise would have been liable, with any remaining amounts being used to cover administrative expenses. PSOF 132.

TIAA-CREF asserts first that it did not violate section 406 "because [it] did not invest any amounts in the retirement accounts of Plaintiffs after the respective Effective Dates." Doc. 341 at 29. This rather puzzling statement appears to be premised on TIAA-CREF's argument that, as soon as customers asked it to transfer or redeem their fund shares, such shares ceased to be plan assets—even if TIAA-CREF does not process the order for days or weeks. Plaintiffs addressed this argument in Part IIB above, in the context of their section 404 claim. The analysis is the same under section 406. Briefly put, "until the check to the beneficiary is actually presented to the plan for payment through the banking system, and paid, the money due to the beneficiary is an asset of the plan." *Vega*, 174 F.3d at 873.[28]

---

[28] Although TIAA-CREF relies on *Faber v. Metropolitan Life Ins. Co.*, 648 F.3d 98 (2d Cir. 2011), that case is not to the contrary. In *Faber*, the defendant provided the plan participant's beneficiary and his estate a life insurance benefit with the so-called "Total Control Account" ("TCA") feature, exactly as the plan document called for. *See* 648 F.3d at 100-01. As the Second Circuit explained, the plan participant's beneficiary (Carol Faber) and the estate received "customer agreements and checkbooks," just as the plan document said they would. *Id.* at 101. The Second Circuit held that, since Met Life had

gravel &
shea  ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

TIAA-CREF next contends that any use of Plaintiffs' funds was not for its benefit, or at least "there is no evidence that TIAA-CREF knew or should have known that its practice would benefit a party in interest." Doc. 341 at 30. The short answer is that the statute forbids the "use by *or* for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D) (emphasis added). Since TIAA-CREF "used" Plaintiffs' funds, there is no need to show a "benefit." The statutory language is in the disjunctive. Nor is an intent to benefit required: the "protection of beneficiaries . . . requires . . . that liability be imposed even when there is no taint of scandal, no hint of self-dealing, no trace of bad faith." *Lowen*, 829 F.2d at 1213 (internal quotation omitted). TIAA-CREF did in fact benefit, however, because by using TFE Gains TIAA-CREF Services avoided digging into its own pocket to cover hundreds of millions of dollars in investor losses caused by its own processing delays. *See* Part IIB of the Background section.

Finally, TIAA-CREF argues that section 406 does not apply because no "party-in-interest" was involved. Doc. 341 at 31. The parties-in-interest were TIAA-CREF and "each of the entities of which it is comprised," including TIAA-CREF Services which held the "TFE Gain" account. *See* Doc. 341 at 31. A "party-in-interest" is very broadly defined under ERISA to include "a person providing services to [an employee benefit] plan." ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B). TIAA-CREF and each of its Defendant affiliates fit the bill. *See*

provided "all of the benefits promised by the Plans, in the manner provided by the Plans," "it discharged its obligations as a claims administrator and ceased to be an ERISA fiduciary" when it delivered the checkbook. *See id.*, 648 F.3d at 104-05. It followed that, since Met Life was no longer a fiduciary after delivering the TCA checkbook, its underlying assets could not be considered "plan assets." *Id.* at 105.

In contrast to *Faber*, TIAA-CREF did *not* deliver "all of the benefits promised by the Plans, in the manner provided by the Plans" in the instant case. It had not delivered anything at the time it began using Plaintiffs' funds as its own. Unlike Ms. Faber, Plaintiffs could not write a check for their money; TIAA-CREF alone controlled when that check was written. Nor did it ever deliver the "benefits promised by the Plans"; *viz.*, the value of the participant's account on the Processing Date. Finally, TIAA-CREF did not deliver the benefit *when* its prospectus said it must: within seven calendar days of the Good Order Date.

gravel &
shea  ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 30 -

*Sandoval v. Simmons*, 622 F. Supp. 1174 (C.D. Ill. 1985) (investment manager, company whose investment policies it controlled, and corporation to which it was related were all "parties in interest"); *see also Chao v. Hochuli*, 244 F. Supp. 2d 92 (E.D.N.Y. 2003); *Reich v. Polera Bldg. Corp.*, 1996 U.S. Dist. LEXIS 1365 (S.D.N.Y. 1996). TIAA-CREF easily meets this criterion. *See* PSOF 153 and Ex. 13 (Mark Johnson Decl. ¶ 11). Since TIAA-CREF is a party-in-interest, and since "parties in interest" may be sued directly for violations of section 406 under *Harris Trust,* TIAA-CREF's confusing discussion as to whether its customers are or are not parties-in-interest misses the point. *Cf.* Doc. 341 at 31. Plaintiffs' section 406 transaction claim should stand.[29]

III.    PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM PRESENTS QUESTIONS
        OF FACT WHICH PRECLUDE SUMMARY JUDGMENT IN FAVOR OF TIAA-CREF.

As the Second Circuit has recognized, the question of whether an ERISA fiduciary breached his duty of loyalty presents a factual issue. *See Donovan v. Bierwirth*, 680 F.2d 263, 276 (2d Cir. 1982) ("How the situation will appear at trial is a different matter which we cannot now decide"). Necessary predicte questions, such as whether a defendant is an ERISA fiduciary in the first place and whether particular funds are "plan assets," are also mixed questions of law

---

[29] TIAA-CREF also asserts it is entitled to summary judgment on Plaintiffs' breach of impartiality claim, *see* Doc. 341 at 24-29, but its arguments on that point need little further discussion. Plaintiffs have explained that TIAA-CREF was a fiduciary because it had actual control of the timing of plan participants' distributions. *See* Part IIB, *supra; Blatt*. Plaintiffs have acknowledged that the duty of impartiality does not "automatically" require TIAA-CREF to provide the same treatment to non-ERISA and ERISA accountholders, but does require a reasonable basis for different treatment. *See* Part IB, above. Finally, the payment in *Rink* did affect the plan assets of many class members here. As Mr. Van Dolsen succinctly put it at his deposition, the cost of any gain or loss is passed onto plan participants. PSOF 140. As TIAA-CREF further explains in its Memorandum, "[t]hose costs, in turn, reduced the value at which Units [*i.e.*, fund shares] in the Accounts could be redeemed." Doc. 341 at 16. Since many class members here were invested in TIAA-CREF at the time it settled *Rink*, their plan assets were affected. Doc. 341 at 16.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION

- 31 -

and fact. *See, e.g., LoPresti v. Terwilliger*, 126 F.3d 34, 39 (2d Cir. 1997) (reversing District

Court's determination that defendants were not fiduciaries); *Phones Plus, Inc. v. The Hartford*

*Fin. Servs. Group, Inc.*, 2007 U.S. Dist. LEXIS 78767, *13-*14 (D. Conn. Oct. 23, 2007)

("whether a given item constitutes 'plan assets' is also, like the question of fiduciary status, a

mixed question of fact and law").

 TIAA-CREF has not met its burden of showing that the record evidence supports

judgment in its favor on any of these issues, as Federal Rule of Civil Procedure 56 requires. *See*

*Salahudin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006).  Indeed, as this Opposition points out, the

evidence points against TIAA-CREF, especially when "all ambiguities" and "all inferences" are

drawn in Plaintiffs' favor.  Accordingly, its motion for summary judgment should be denied.

Conclusion

 As a fiduciary, TIAA-CREF should not have delayed processing Plaintiffs' transfer

orders for more than seven days, and it should not have retained their investment gains when it

did.  It recognized its error when it paid the non-ERISA accountholders in *Rink* the amount of

such gains, but it inexplicably refuses to pay its ERISA beneficiaries anything.  Its motion for

summary judgment should be denied.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

Dated:    Burlington, Vermont
            July 25, 2013

 

*/s/ Norman Williams*
Norman Williams, Esq.
Robert B. Hemley, Esq.
Gravel & Shea PC
76 St. Paul Street, 7th Floor, P. O. Box 369
Burlington, VT  05402-0369
(802) 658-0220
nwilliams@gravelshea.com
rhemley@gravelshea.com
      and
Thomas A. Tucker Ronzetti, Esq.
Kenneth Hartmann, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Miami, FL  33134
tr@kttlaw.com
krh@kttlaw.com
For Plaintiffs

<812345v1/NCW>

gravel &
shea  ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION